# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JENNIFER CHAO,

        Plaintiff,

    v.

HARTFORD LIFE INSURANCE
COMPANIES, INC.; HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY, a
member of Hartford Insurance Group;
CHRISTIANA CARE HEALTH SYSTEM,
INC., f/k/a Medical Center of Delaware Group
Long Term Disability Insurance Plan;
CHRISTIANA CARE HEALTH SYSTEM,
INC., f/k/a Medical Center of Delaware,

        Defendants.

C.A. No.

JURY TRIAL OF 12 DEMANDED

## COMPLAINT

### NATURE OF THE ACTION, JURISDICTION AND VENUE

1.    This is an action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 *et seq.* ("ERISA"), to recover employee benefits, to compel compliance with both an employee benefit plan and ERISA, and to recover costs and counsel fees.

2.    This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) (ERISA) and 28 U.S.C. §1331 (federal question).

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and under ERISA, 29 U.S.C. § 1132(e)(2).

4.    Ms. Chao has exhausted all administrative remedies in order to bring this action.

*PARTIES*

5.      Plaintiff Jennifer Chao is an adult resident and citizen of the State of

Delaware residing at 2223 Naamans Road; Wilmington, Delaware 19810.  Ms. Chao is a

participant of the Plan (as defined below) within the meaning of ERISA, 29 U.S.C. §

1002(7).  Ms. Chao is a beneficiary of the Plan within the meaning of ERISA, 29 U.S.C.

§ 1002(8).  Ms. Chao has standing to bring this action under ERISA, 29 U.S.C. §

1132(a)(1).

6.      Defendant Hartford Life and Accident Insurance Company is a

Connecticut corporation that, upon information and belief, is authorized to engage in the

insurance business in the State of Delaware.  Hartford has a mailing address of P.O. Box

2999, Hartford, Connecticut 06104-2999.  Pursuant to 18 Del. C. § 524, Hartford's agent

for service of process is the Insurance Commissioner of Delaware.  Hartford is the insurer

and administrator of the Plan and has fiduciary duties under ERISA with respect to the

Plan.

7.      Defendant Hartford Life Insurance Companies, Inc., ("Hartford Life")

upon information and belief, is the parent company of Hartford Life and Accident

Insurance Company.  Hartford Life is a Connecticut corporation which maintains a place

of business at 200 Hopmeadow Street, Simsbury, Connecticut 06089.  Pursuant to 18

Del. C. § 524, Hartford's agent for service of process is the Insurance Commissioner of

Delaware (collectively, the Hartford Life and Accident Insurance Company and Hartford

Life are referred to as "Hartford").

8.      Defendant Christiana Care Health System, Inc., f/k/a Medical Center of

Delaware Group Long Term Disability Insurance Benefit Plan ("Christiana Long Term

Disability"), is a Delaware corporation registered to do business in Delaware. Christiana Group Long Term Disability's registered agent for service of process is 501 West 14th Street; Wilmington, Delaware 19899.

9.    Defendant Christiana Care Health System, Inc., f/k/a Medical Center of Delaware ("Medical Center of Delaware"), is a Delaware corporation registered to do business in Delaware. Medical Center of Delaware's registered agent for service of process is 501 West 14th Street; Wilmington, Delaware 19899 (collectively, Christiana Long Term Disability and Medical Center of Delaware are referred to as "Christiana").

### *FACTS*

10.    Between 1990 and 1996, Ms. Chao was employed as a certified registered nurse for Christiana Hospital.

11.    In May 1993, Ms. Chao became pregnant with her first child during which time she experienced pain in her lower back area.

12.    After giving birth to a healthy baby boy on March 2, 1994, Ms. Chao returned to part-time work for Christiana and eventually became a fulltime nurse again in September 1994.

13.    However, due to the progression of the pain, in October 1994 Ms. Chao again reverted back to part-time status (32 hours per week).

14.    Eventually, Ms. Chao began to take leave from her job due to her pain.

15.    Ms. Chao was examined by numerous doctors in an attempt to determine the cause of her pain.

16.    On or about February 12, 1996, Ms. Chao was first diagnosed with fibromyalgia, a debilitating chronic disorder causing widespread muscle pain and fatigue.[1]

17.    Symptoms of fibromyalgia caused Ms. Chao to become disabled and unable to work.

18.    Ms. Chao suffers certain limitations, including but not limited to, the inability to walk more than a few blocks, the inability to sleep restfully, the inability to concentrate, the inability to easily hold or play with her son who was about 2 years old at the time of diagnosis and chronic fatigue.

19.    As a result, on or about September 7, 1995, Ms. Chao filed a claim for Long Term Disability ("LTD") benefits pursuant to the Christiana Care Health System LTD Employee Benefits Plan, f/k/a Medical Center of Delaware Group Disability Insurance (the "Plan") sponsored by Medical Center of Delaware.

20.    The Plan is defined as a "Welfare Benefit Plan providing Long Term Disability benefits for Employees of Medical Center of Delaware."

21.    The Plan is insured by the Hartford Life and Accident Insurance Company.

---

[1] *Post v. Hartford Ins. Co.*, 501 F.3d 154 (3d Cir. 2007), In the words of Judge Posner, fibromyalgia is a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. Citing, *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir.1996) (internal citations omitted).

22.     On May 16, 1996 Hartford advised Ms. Chao that her request was granted and she was approved for LTD benefits.

23.     For almost the next ten years, Hartford continued to provide LTD benefits to Ms. Chao.

24.     On April 28, 2006 Hartford prematurely terminated Ms. Chao's LTD benefits.

25.     Ms. Chao timely appealed the termination and denial of LTD benefits pursuant to Plan on October 19, 2006.

26.     Hartford again denied Ms. Chao's appeal and upheld the decision to terminate her LTD benefits.

27.     At all relevant times and pursuant to the Plan, Hartford promised eligible employees monthly benefits if one became totally disabled until the date an employee is no longer disabled, among other reasons for termination of benefits.  A copy of the Plan is attached hereto as Exhibit A.

28.     At all relevant times, Ms. Chao was an eligible employee pursuant to the Plan.

29.     At all relevant times, Ms. Chao and Hartford were parties to a contract under which Christiana assigned and Hartford accepted responsibility for serving as administrator of the Plan.

30.     As a consequence of this arrangement, Hartford was in the dual role of both funding the Plan benefit payments and deciding who was eligible for Plan benefits.

31.     Hartford's direct financial interest in whether Plan claims are approved or denied conflicts with the interests of Plan participants.

32.     The Plan provides that a person is eligible for benefits under the Plan if the person is in a class eligible for coverage and has satisfied the "Eligibility Waiting Period."

33.     The Plan provides that all "Active Full-Time Employees whose Annual Rate of Basic Earnings is $30,000.00 or more" are in a class eligible for coverage.

34.     The Plan defines an Active Full-Time Employee as an employee who works 80 hours per pay period.

35.     The Plan defines the Eligibility Waiting Period as follows:

> If you are working for the Policyholder on the Policy Effective Date – The first day of the month following the date on which you complete 90 days of continuous services in the eligible class.
>
> If you start working for the Policyholder after the Policy Effective Date – The first day of the month following the date on which you complete 90 days of continuous service in the eligible class.

36.     The Plan defines the Policy Effective Date as January 1, 1992.

37.     Ms. Chao's employment with Medical Center of Delaware (n/k/a "Christiana") began on or about February 1, 1992.

38.     Ms. Chao was an Active Full-Time Employee and satisfied the Eligibility Waiting Period.

39.     At all relevant times during her employment with Christiana, Ms. Chao was eligible to and did participate in the Plan.

40.     With respect to Long Term Disability, the Plan provides eligible employees three options, a Basic Plan or one of two Supplemental Plans.

41.     Ms. Chao selected Supplemental Plan, Option 1 ("Option 1").

42.    Option 1 provides a Benefit Percentage of 65% after the Elimination Period.

43.    The Elimination Period for Option 1 is "the first 6 months of any one period of Total Disability."

44.    Disability under the Plan is defined as "any accidental bodily injury, sickness or pregnancy."

45.    Totally Disabled is defined by the Plan as follows:

> (a) during the Elimination Period; and (b) for the next 60 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis. After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education, or experience.

46.    At all relevant times during her employment with Christiana, Ms. Chao was eligible for, and selected to receive, Long-Term Disability Insurance pursuant to Option 1 under the Plan.

47.    Ms. Chao's last day of employment with Christiana was September 6, 1995.

48.    Ms. Chao was diagnosed totally disabled within the meaning of the Plan and was entitled to, and did receive, LTD benefits as of March 7, 1996.

49.    Pursuant to the Plan, benefit payment due to disability will occur monthly if:

> (1) you became Totally Disabled while insured under this plan;
> (2) you are Totally Disabled throughout the Elimination Period;
> (3) you remain Disabled beyond the Elimination Period; and
> (4) you submit Proof of Loss satisfactory to The Hartford.

50.    Ms. Chao did become Totally Disabled while insured under the Plan.

51.    Ms. Chao remained Totally Disabled throughout the Elimination Period.

52.    Ms. Chao remained Disabled beyond the Elimination Period.

53.    Ms. Chao, throughout all times relevant, submitted proof of total disability to Hartford as requested.

54.    The Plan provides disability benefits will cease when one of the following occurs:

> (1) the date you are no longer Disabled;
> (2) the date you fail to furnish proof that you are continuously Disabled;
> (3) the date you refuse to be examined, if The Hartford requires an examination;
> (4) the date you die; or
> (5) the date [Ms. Chao reaches age 65.]

55.    From 1996 to date, Ms. Chao has continuously remained, and still remains, Totally Disabled according to the definition of the Plan.

56.    Pursuant to the requirements of the Plan, Ms. Chao consistently and continuously provided proof of her continued total disability through personal statements and through statements of various treating physicians.

57.    Ms. Chao never refused a medical examination requested by Hartford.

58.    Ms. Chao has not reached 65 years old, nor has Ms. Chao died.

59.    Nevertheless, on April 28, 2006, Hartford advised Ms. Chao that her LTD benefits would be terminated.  This termination letter is attached hereto as <u>Exhibit B</u>.

60.    Hartford incorrectly concluded Ms. Chao was no longer Totally Disabled pursuant to the definition of the Plan.

61.    Specifically, Harford erroneously asserts that Ms. Chao has "the capacity to return to work at the light, medium and sedentary levels."

62.    Ms. Chao timely appealed the termination of benefits on October 19, 2006, providing Hartford with numerous doctors' opinions; family, friends and neighbors' viewpoint and information relating to the effects of fibromyalgia.  The appeal filed by Ms. Chao is attached hereto as Exhibit C.

63.    On December 1, 2006, Hartford, as administrator of the Plan and an insurer having a direct economic interest in the determination, issued its appeal decision, again declining to provide Ms. Chao continuing Long Term Disability benefits.  The appeal decision is attached hereto as Exhibit D.

64.    Due to the sporadic and debilitating nature of fibromyalgia, Ms. Chao is still, and has continuously been, unable to return to work, part-time or otherwise.

65.    Hartford's termination of Ms. Chao's LTD benefits was improper as Ms. Chao is totally disabled and incapable of performing any type of work.

66.    Hartford incorrectly based its termination of Ms. Chao's LTD benefits on the fact that Ms. Chao was sporadically able to perform certain routine activities, such as taking her son to school, a fact which was always voluntarily provided to Hartford by Ms. Chao through her numerous personal statements provided upon Hartford's request.

67.    Hartford improperly failed to consider the fluctuation of fibromyalgia which causes Ms. Chao to have "good days and bad days;" a fact Ms. Chao and her treating doctors consistently advised Hartford of throughout the ten years of benefits Hartford provided to Ms. Chao.

68.    Hartford unacceptably placed its financial interest above the interests of Ms. Chao.

69.    Hartford's conduct was arbitrary and capricious.

## COUNT I

### *CLAIM TO RECOVER BENEFITS UNDER ERISA PLAN*

70.     Plaintiff Ms. Chao incorporates by reference and reasserts paragraphs 1-69 as if fully restated herein.

71.     Ms. Chao has satisfied all legitimate Plan requirements and is entitled to Long Term Disability benefits under the Plan.

72.     Hartford is the Plan insurer and has control of the Plan and the claims process.

73.     Hartford is the Plan administrator under ERISA and owes a fiduciary duty to all Plan participants and beneficiaries.

74.     Hartford, as Christiana's agent, has responsibility to administer the Plan in good faith and without regard for its own economic interests.

75.     Hartford has wrongfully and repeatedly denied Ms. Chao benefits to which she is entitled under the Plan.

76.     In denying Ms. Chao's claim for continuous Long Term Disability, Hartford placed its own pecuniary interests above the rights of Ms. Chao.

77.     Ms. Chao is entitled to and seeks to recover benefits under the Plan.

78.     Ms. Chao seeks equitable relief under 29 U.S.C. §1132(a), including a declaratory judgment that she is entitled to Long Term Disability benefits pursuant to the Plan.

79.     Ms. Chao seeks an injunction directing Hartford to comply with the terms of the Plan and ERISA.

80.     Under 29 U.S.C. §1132(a)(1), Ms. Chao seeks clarification of her rights to Long Term Disability benefits under the Plan.

81.     Hartford's denial of benefits was erroneous as a matter of law.

82.     Hartford's denial of benefits was erroneous as a matter of fact.

83.     Hartford's denial of benefits was arbitrary and capricious.

84.     Hartford's denial of benefits was an abuse of discretion.

85.     Hartford's denial of benefits was contrary to Ms. Chao's rights under the Plan and ERISA.

86.     Hartford breached its contractual and legal obligations to Ms. Chao by prematurely terminating her Long Term Disability benefits under the Plan.

87.     Ms. Chao has exhausted all administrative requirements of the Plan and ERISA.

## COUNT II

### *ATTORNEY'S FEES AND COSTS*

88.     Plaintiff Ms. Chao incorporates by reference and reasserts paragraphs 1-87 as if fully restated herein.

89.     Ms. Chao's pursuit of this action advances the interests of all participants and beneficiaries in the Plan as well as other plans with which Hartford is involved, and the relief sought hereunder will benefit all such participants and beneficiaries.

90.     Ms. Chao is entitled to recover "reasonable attorney's fees and costs of the action" herein pursuant to ERISA, 29 U.S.C. §1132(g)(1).

**WHEREFORE,** plaintiff, Jennifer Chao, prays that this Honorable Court enter judgment in her favor and against Hartford as follows:

(a)     Declaring that Ms. Chao is Totally Disabled pursuant to the definition within the Plan;

(b)     Declaring that Ms. Chao is entitled to Long Term Disability benefits under the Plan;

(c)     Ordering Hartford to make a full accounting of all Long Tem Disability benefits due to Ms. Chao under the Plan;

(d)     Ordering Hartford to pay all benefits due to Ms. Chao under the Plan;

(e)     Ordering Hartford to pay pre-judgment interest on all benefits due and owing to Ms. Chao since the termination date;

(f)     Ordering Hartford to pay post-judgment interest on all benefits due and owing to Ms. Chao;

(g)     Ordering Hartford to pay Ms. Chao's attorney's fees and costs incurred in this matter;

(h)     Issuing an injunction prohibiting Hartford from future breaches of its duties under ERISA and the Plan; and

(i)    Ordering such other and further relief as the Court deems just and

necessary.

Dated:  November ___, 2007        OBERLY, JENNINGS & RHODUNDA, P.A.


William J. Rhodunda, Jr. (No. 2774)
Chandra J. Rudloff (No. 4907)
1220 Market Street, Suite 710
P.O. Box 2054
Wilmington, DE 19899
(302) 576-2000
Attorney for Plaintiff

# Exhibit A

*(Christiana Care Health System Long Term Disability Benefits Plan, f/k/a Medical Center of Delaware Group Disability Insurance)*

# Group
# Benefits
# Plan

The Plan Described in this Booklet

is Insured by the

**Hartford Life and Accident Insurance Company**
Hartford, Connecticut

Member of The Hartford Insurance Group



**MEDICAL CENTER OF DELAWARE**



**THE HARTFORD**

Printed in U.S.A.  10-93

orm BC-3322R(GLT)(2)

11247-0

## TABLE OF CONTENTS

Sec.

Certificate of Insurance .................. I
Plan of Insurance ..................... II
Definitions ........................ II
Dates of Eligibility and Coverage ......... III
Termination ....................... IV
Benefits .......................... V
Exclusions ........................ VI
General Provisions ................... VII
Claims ........................... VII

PS-M-33a

1

Section I

## HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
(Herein called The Hartford)

### CERTIFICATE OF INSURANCE
Under
The Group Insurance Policy
as of the Effective Date
Issued by
The Hartford
to
the Policyholder

This is to certify that The Hartford has issued and delivered The Group Insurance Policy to the Policyholder.

The Policy insures the Policyholder's employees who:

- are eligible for the insurance;
- become insured; and
- continue to be insured;

according to the terms of the Policy.

The terms of the Policy which affect your insurance are contained in the following pages.

This Certificate of Insurance and the following pages will become your Booklet-certificate. This Booklet-certificate is a part of the Policy.

This Booklet-certificate replaces any other which The Hartford may have issued to the Policyholder to give to you under the Group Insurance Policy specified herein.

## HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY

Bruce D. Gardner, Secretary

Lowndes A. Smith, President

GR-2025(302)A

2

---

## PLAN OF INSURANCE
### GENERAL PROVISIONS

THE GROUP INSURANCE POLICY: GLT-33229

THE POLICY EFFECTIVE DATE: January 1, 1992

THE POLICYHOLDER: MEDICAL CENTER OF DELAWARE

ELIGIBLE CLASS(ES): All Active Full-Time Employees whose Annual Rate of Basic Earnings is $30,000.00 or more.

ELIGIBILITY WAITING PERIOD: If you are working for the Policy-holder on the Policy Effective Date - The first day of the month following the date on which you complete 90 days of continuous service in the eligible class.

If you start working for the Policyholder after the Policy Effective Date - The first day of the month following the date on which you complete 90 days of continuous service in the eligible class.

BASIS OF INSURANCE: This insurance is provided on a Non-Contributory basis with respect to the Basic Plan and on a Contrib-utory basis with respect to the Supplemental Plans of Option 1 and Option 2.

INTERPRETATION OF POLICY TERMS AND CONDITIONS
The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

3

BC-33229(GLT)(2)



## Section I

## PLAN OF INSURANCE

### DEFINITIONS

ACTIVE FULL TIME EMPLOYEE: 80 hours per pay period.

**Basic Plan**

ELIMINATION PERIOD: The first 3 months of any one period of Total Disability.

**Supplemental Plans**
**Option 1**

ELIMINATION PERIOD: The first 6 months of any one period of Total Disability.

**Option 2**

ELIMINATION PERIOD: The first 3 months of any one period of Total Disability.

If you cease to be Totally Disabled and return to work for a total of 14 days or less during an Elimination Period, the Elimination Period will not be interrupted or extended.

Except for the 14 days or less you work, you must be Totally Disabled by the same condition for the total Elimination Period.

**THE OPTION YOU ELECT MUST BE INDICATED ON YOUR GROUP INSURANCE ENROLLMENT FORM**

ANNUAL ENROLLMENT PERIOD: December 1 through December 31 of each year.

OTHER INCOME BENEFITS: Family Social Security is not included.

MONTHLY RATE OF BASIC EARNINGS: Commissions are not included.




BC-33229(GLT)(2)

4

## PLAN OF INSURANCE

### DEFINITION OF TOTAL DISABILITY

Totally Disabled means that:
(a) during the Elimination Period; and
(b) for the next 60 months,

you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis. After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education, or experience.

### REPLACEMENT OF PRIOR GROUP LONG TERM DISABILITY PLAN

If you are eligible for benefits for a disability under a prior long term disability plan which:

(1) was sponsored by the Policyholder; and
(2) was terminated on the day before the effective date of this plan, then no benefits will be payable for the Disability under this plan.

**Basic Plan**

BENEFIT PERCENTAGE: 40%

**Supplemental Plans**
**Option 1**

BENEFIT PERCENTAGE: 65%

**Option 2**

BENEFIT PERCENTAGE: 65%

**THE OPTION YOU ELECT MUST BE INDICATED ON YOUR GROUP INSURANCE ENROLLMENT FORM**



5

BC-33229(GLT)(2)

Section I

## PLAN OF INSURANCE

MAXIMUM MONTHLY BENEFIT: $10,000.00

MINIMUM MONTHLY BENEFIT: In no event shall the amount of Monthly Benefit calculated be less than $50.00.

TREATMENT FREE PERIOD: 90 days

PERIOD OF COVERAGE: 365 days

PRE-EXISTING CONDITION LIMITATION : No Loss/No Gain is included.

6

## DEFINITIONS

The terms listed, if used, will have these meanings.

**You** means the Insured Person to whom this Booklet-certificate is issued.

**Contributory Insurance** means insurance for which you enroll and agree to pay all or part of the cost.

**Non-Contributory Insurance** means insurance for which you pay no part of the cost.

**Active Full-time Employee** means an employee who works for the Policyholder on a regular basis in the usual course of the Policyholder's business. The employee must work the number of hours in the Policyholder's normal work week. This must be at least the number of hours indicated in the Plan of Insurance.

**Disability** means any accidental bodily injury, sickness, or pregnancy.

**Eligibility Waiting Period** means the number of continuous days of service you must satisfy as an Active Full-time Employee in a class eligible for insurance before your coverage under the Group Insurance Policy becomes effective. See the Plan of Insurance for the Eligibility Waiting Period.

**Elimination Period** means the period of time you must be Totally Disabled before benefits become payable. See the Plan of Insurance for the Elimination Period. The Elimination Period applicable to you will be based upon your election of Supplemental Coverage.

**Monthly Benefit** means a monthly sum payable to you while you are Disabled, subject to the terms of the Group Insurance Policy.

7



BC-3322a(GLT)(2)

Section II

## DEFINITIONS

**Pre-existing Condition** means any Disability, diagnosed or undiagnosed, for which you receive Medical Care during the 365 day period which ends on the day before:

(1) your effective date of insurance; and

(2) the effective date of a Change in Coverage.

All manifestations, symptoms or findings which result:

(1) from the same or related Disability; or

(2) from any aggravations of a Disability,

are considered to be the same Disability for the purpose of determining a Pre-existing Condition.

**Medical Care** means care which is received when:

(1) a Physician is consulted or medical advice is given; or

(2) treatment is recommended or prescribed by, or received from a Physician.

Treatment, as used above, includes, but is not limited to:

(1) any medical examinations, tests, attendance or observation;

(2) any medical services, supplies or equipment, including their prescription or use; or

(3) any prescribed drugs or medicines, including their prescription or use.

**Physician** means a legally qualified physician who is practicing within the scope of his license.

**Other Income Benefits** means the benefits shown below:

(1) The amount of disability, retirement, pension or annuity benefits from any:

(a) group insurance or pension plan;

(b) military retirement pension plan;

(c) the Jones Act;

(d) Railroad Retirement Act;

(e) plan or arrangement of coverage, whether insured or not, as a result of employment by or association with the Policyholder or as a result of membership in or association with any:

(i) group;

(ii) association;

(iii) union; or

(iv) other organization; or

(f) plan provided by law.

8

## DEFINITIONS

**Other Income Benefits** (Continued)

(2) The amount of benefits to which you are entitled under any:

(a) worker's compensation law;

(b) occupational disease law;

(c) unemployment compensation law;

(d) compulsory benefit act or law; or

(e) other act or law of like intent.

(3) Any damages or settlement (exclusive of fees and interest) which is made in lieu of worker's compensation benefits and paid to you, your employer, or a worker's compensation insurer; but only to the extent that any damages or settlement represent your loss of income.

(4) any damages recovered (less any reasonable legal fees and costs associated with the recovery) due to an act or omission of a Third Party, but only to the extent that such damages represent your loss of income.

(5) any disability income received from a "no-fault" automobile policy.

(6) The amount of disability or retirement benefits under the United States Social Security Act to which you may be entitled because of disability or retirement.

(7) If Family Social Security is included in your Plan of Insurance, the amount of disability or retirement benefits under the United States Social Security Act to which your spouse and children may be entitled because of your disability or retirement.

Other Income Benefits will include:

(1) early retirement benefits if you so elect;

(2) disability income benefits under a group life insurance plan regardless of whether you may or may not elect to apply for such benefits even though you are Disabled; and

(3) temporary and permanent disability benefits provided under any Worker's Compensation law or any other act or law of like intent.

If you are paid Other Income Benefits in a lump sum, The Hartford will pro-rate the lump sum:

(1) over the period of time it would have been paid if not paid in a lump sum; or

(2) if such period of time cannot be determined, over a period of 60 months.

9



Section II

## DEFINITIONS

**Other Income Benefits** (Continued)

If you are Disabled and you receive Other Income Benefits in a lump sum, they will be considered Other Income Benefits regardless of any roll-over provision or election into any fund, plan or arrangement. The Hartford may make a retroactive allocation of any retroactive Other Income Benefit payments.

Other Income Benefits will not include:

(1) proceeds from any;
 (a) source of personal investment income;
 (b) personal disability income plan, unless the plan is obtained through a group-sponsored or employer-related program; or
 (c) Veteran's Administration Disability benefits.
(2) distribution from any form of profit sharing regardless of pre-tax or after-tax treatment as found under Section 401(k) of the Internal Revenue Code;
(3) proceeds or income from any:
 (a) Individual- or employer- sponsored I.R.A., Individual Tax Sheltered Annuity, or any deferred compensation plan;
 (b) Employee Stock Option Plan or any thrift plan;
 (c) a partner or proprietor H.R. 10 (Keogh Plan) under the Self-Employed Individual Tax Retirement Act; or
 (d) a capital account.
(4) the amount of any increase in benefits paid under any federal or state law, if the increase:
 (a) takes effect after the date benefits become payable under Policy; and
 (b) is a general increase which:
  (i) is required by law; and
  (ii) applies to all persons who are entitled to such benefits.

**Salaried Employee** means an Active Full-time Employee who:
(1) does only tasks which are administrative, sales, clerical or supervisory; and
(2) is paid by the Policyholder on a regular salaried basis.

**Non-Salaried Employee** means an Active Full-time Employee who:
(1) is paid by the hour; or
(2) does not meet this plan's definition of Salaried Employee.

## DEFINITIONS

**Rehabilitative Employment** means employment or service which:
(1) prepares a Disabled person to resume gainful work; and
(2) is approved, in writing, by The Hartford.

The term Rehabilitative Employment will include, when appropriate, any necessary and feasible:
(1) vocational testing;
(2) vocational training;
(3) work-place modification;
(4) prosthesis; and
(5) job placement.

**Monthly Income** means the sum of:
(1) your Monthly Rate of Basic Earnings; and
(2) any disability or retirement benefits which were being paid before you became Totally Disabled, except any benefits:
 (a) provided by the Policyholder's Employee Benefit Plan;
 (b) paid by a personal policy; or
 (c) received from the Veteran's Administration.

**Monthly Rate of Basic Earnings** means your regular monthly pay, not counting:
(1) commissions*;
(2) bonuses;
(3) overtime pay; or
(4) any other fringe benefit or extra compensation.

*See the Plan of Insurance to determine whether Monthly Rate of Basic Earnings includes commissions.

If you become Totally Disabled, your Monthly Rate of Basic Earnings will be the rate in effect on the October 1 of the prior calendar year before becoming Disabled.

**Current Monthly Earnings** means the monthly earnings you re-ceive from any employer or for any work, while Disabled and eligible for Partial Disability benefits under this plan.

Section II

## DEFINITIONS

Indexed Pre-disability Earnings: means your Pre-disability Earnings adjusted annually by 7%. The first adjustment will take effect on the first July 1st to occur following one full calendar year during which you have been continuously Disabled. After this first adjustment, your Pre-disability Earnings will be increased by additional adjustments of 7% on each July 1st, up to a maximum of 5 adjustments. *only CLT on Partial Disof*

Pre-disability Earnings: means your Monthly Rate of Basic Earnings in effect on the date immediately prior to becoming Totally Disabled.

Disabled means either Totally or Partially Disabled.

Totally Disabled: See the Plan of Insurance for the definition of Totally Disabled.

Partially Disabled means that you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full-time basis, except that:

(1) you are performing at least one of the material duties of your own occupation on either a full-time or part-time basis;

(2) you are under the continuous care of a Physician; and

(3) you are currently earning at least 20% less per month than your Indexed Pre-disability Earnings due to the same injury or sickness that caused the Disability.

## DATES OF ELIGIBILITY AND COVERAGE

Eligible Persons: All persons who are in the class or classes which are shown on the Plan of Insurance will be considered Eligible Persons.

When You Are Eligible: You will become eligible for coverage on either:

(1) the Policy Effective Date, if you have completed the Eligibility Waiting Period; or if not

(2) the date on which you complete the Eligibility Waiting Period.

See the Plan of Insurance for the Eligibility Waiting Period.

When You Are Insured - Non-Contributory Insurance: Your coverage will begin on the date you become eligible.

When You Are Insured - Contributory Insurance: Your coverage will begin on the earliest to occur of the following dates:

(1) the date you become eligible, if you enroll or have enrolled by then;

(2) the date on which you enroll, if you do so within 31 days after the date you are eligible; or

(3) the date The Hartford approves evidence of insurability. Evidence is required if you enroll more than 31 days after you become eligible. Any evidence of insurability must be furnished at your own expense; or

(4) the January 1 next following the date on which you enroll, if you enroll during the Annual Enrollment Period. Please see the Plan of Insurance for the Annual Enrollment Period.

If you become ineligible for insurance before you submit any required evidence of insurability to The Hartford, and you later become eligible, you will still be required to furnish such evidence.

All of the above dates are subject to the Deferred Effective Date provision below.

Deferred Effective Date: If you are absent from work due to Disability on the date your insurance would otherwise have become effective, your effective date will be deferred. Your insurance will not become effective until you work one regular working day.

Enrollment: To enroll for insurance, you must:

(1) complete and sign a group insurance enrollment card which is satisfactory to The Hartford; and

(2) deliver it to the Policyholder.

12

13

NS

# BENEFITS

## Article 1. Benefit Payment Due to Disability

You will be paid a monthly benefit if:
(1) you become Totally Disabled while insured under this plan;
(2) you are Totally Disabled throughout the Elimination Period;
(3) you remain Disabled beyond the Elimination Period; and
(4) you submit Proof of Loss satisfactory to The Hartford.

Benefits accrue as of the first day after the Elimination Period and are paid monthly. No benefit will be paid for any day on which you are not under the care of a Physician.

The Hartford will cease benefit payment on the first to occur of:
(1) the date you are no longer Disabled;
(2) the date you fail to furnish proof that you are continuously Disabled;
(3) the date you refuse to be examined, if The Hartford requires an examination;
(4) the date you die; or
(5) the date determined from the table below.

### MAXIMUM DURATION OF BENEFITS TABLE

| Age When Totally Disabled | Plan With a 3-month Elimination Period Benefits Payable | Plan With a 6-month Elimination Period Benefits Payable |
|---|---|---|
| Prior to Age 62 | To Age 65 | To Age 65 |
| Age 62 | 4 years | 3½ years |
| Age 63 | 3½ years | 3 years |
| Age 64 | 3 years | 2½ years |
| Age 65 | 2½ years | 2 years |
| Age 66 | 2¼ years | 1¾ years |
| Age 67 | 2 years | 1½ years |
| Age 68 | 1¾ years | 1¼ years |
| Age 69 or older | 1½ years | 1 year |

## Article 1.A   Benefit Payment Due to Mental Illness or Substance Abuse

If you are Disabled because of:
(1) Mental Illness which results from any cause;
(2) any condition which may result from Mental Illness;
(3) alcoholism; or
(4) the non-medical use of narcotics, sedatives, stimulants, hallucinogens, or any other such substance,
then, subject to all other Policy provisions, benefits will be payable:

# TERMINATION

## Termination Date of Insurance

Your insurance will terminate on the earliest to occur of the following dates:
(1) the date the Group Insurance Policy terminates;
(2) the date premium payment is due but not paid by the Policyholder;
(3) the last day of the period for which you make any required premium contribution, if you fail to make any further required contribution;
(4) the first day on which you receive benefits from a pension plan provided or sponsored by your employer;
(5) the date you cease to be an Active Full-time Employee in an eligible class including:
    (a) temporary layoff;
    (b) leave of absence; or
    (c) general work stoppage (including a strike or lockout).

If you are granted a leave of absence following a medical leave, the Employer may continue your insurance until the first to occur of, 6 months following your last day of Active Full-time employment or 1 month after the end of a medical leave of absence subject to the following:
    (a) the required premium must be paid; and
    (b) the Employer must not discriminate unfairly among employees in similar situations.

## Continuation of Insurance

If you are Disabled and you cease to be an Active Full-time Employee, your insurance will be continued:
(1) during the Elimination Period while you remain Totally Disabled by the same Disability; and
(2) after the Elimination Period for as long as you are entitled to benefits under the Policy.

During the period for which you are so entitled to benefits, no premium will be due for you.

## Extension of Benefits

If you are entitled to benefits while Disabled and the Group Insurance Policy terminates, benefits:
(1) will continue as long as you remain Disabled by the same Disability, but
(2) will not be provided beyond the date The Hartford would have ceased to pay benefits had the insurance remained in force.

Termination of the Group Insurance Policy for any reason will have no effect on The Hartford's liability under this provision.

## BENEFITS

(1) only so long as you are confined in a hospital or other place licensed to provide Medical Care for your Disability; or

(2) when you are not so confined, a total of 24 months for all such Disabilities during your lifetime.

**Mental Illness**

Any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations or psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage.

**Article 1.B Benefit Payment Due to Partial Disability**

If you:

(1) submit satisfactory proof to The Hartford that you are Partially Disabled within 31 days after the end of a period for which a Monthly Benefit was payable due to Total Disability; and

(2) this Partial Disability results from the same injury or sickness that caused the Total Disability,

then a Monthly Benefit will continue to be payable according to the terms of this Plan.

Benefit payments under this provision will cease, however, on the first to occur of:

(1) the date your Current Monthly Earnings exceed 80% of your Indexed Pre-disability Earnings;

(2) one of the dates described in the third paragraph of Article 1., Benefit Payment Due to Disability; or

(3) the date you return to work in an occupation other than your own. If benefits cease due to this item (3), a benefit may still be payable according to Article 1.C, Benefit Payment Due to Rehabilitative Employment.

16

## BENEFITS

**Article 1.C Benefit Payment due to Rehabilitative Employment**

If you are:

(1) Totally Disabled; or

(2) Partially Disabled and benefits cease because you have returned to work in an occupation other than your own, and if you are engaged in a program of Rehabilitative Employment, then you will continue to be paid a Monthly Benefit.

The amount payable will be based on the last Monthly Benefit payable prior to the commencement of Rehabilitative Employment, and will be reduced by 50% of any income received from each month of Rehabilitative Employment.

The sum of your Monthly Benefit and total income received under this provision may not exceed 100% of your Pre-disability Earnings. If this sum exceeds your Pre-disability Earnings, the Monthly Benefit paid by The Hartford will be reduced proportionately.

**Article 2. Successive Periods of Disability**

If successive Periods of Disability are:

(1) due to the same cause; or

(2) due to a related cause; and

(3) separated by 6 months or less,

then they will be considered one Period of Disability, provided the Group Insurance Policy remains in force.

The term Period of Disability as used in this provision means a continuous length of time during which you are Disabled under this plan.

17

## BENEFITS

### Article 4. Change in Coverage

**Change in Class or Monthly Rate of Basic Earnings**
Your coverage may increase or decrease on the date there is a change in your class or Monthly Rate of Basic Earnings. However, no increase in coverage will be effective unless on that date you:
(1) are an Active Full-time Employee; and
(2) were not absent from work due to Disability during the 30 day period before the change in class or earnings.

Any change in your Rate of Basic Earnings prior to October 1 will become effective on the January 1st on or next following the date The Hartford receives notice of the change.

**Change in the Plan of Insurance**
Any decrease in coverage because of a change in the Plan of Insurance will become effective on the date of the change.

Any increase in coverage because of a change in the Plan of Insurance will become effective on the date of the change, subject to the following limitations:
(1) If you are absent from work due to Disability, the increase will not become effective until you return to work as an Active Full-time Employee.
(2) If you are Disabled due to or contributed to by a Pre-existing Condition which commenced prior to the increase, the increase will not be effective for Disabilities beginning on or after the effective date of the increase until the earlier of:
  (a) the last day of a Treatment Free Period which begins while insured and during which you did not receive Medical Care for the Pre-existing Condition; or
  (b) the last day of a Period of Coverage during which you have been continuously insured under the Group Insurance Policy.

See the Plan of Insurance for the Treatment Free Period and Period of Coverage.

## BENEFITS

### Article 3. Calculation of Monthly Benefit
To determine the Monthly Benefit The Hartford will pay each month while you are Disabled:
(1) multiply your Monthly Income by the Benefit Percentage;
(2) take the lesser of:
  (a) the resulting product; or
  (b) the Maximum Monthly Benefit;
(3) carry forward the amount in Item (2) above and from it subtract:
  (a) all Other Income Benefits, including those for which you could collect but did not apply; and
  (b) 50% of income from Rehabilitative Employment; and
  (c) all other income from any employer or for any work.

The resulting sum will be your Monthly Benefit.

If a Monthly Benefit is payable for less than a month, The Hartford will pay 1/30 of the Monthly Benefit for each day you were Disabled.

See the Plan of Insurance for the Benefit Percentage factor and Maximum Monthly Benefit. The Benefit Percentage applicable to you will be based upon your election of Supplemental Coverage.

See Section II, Definitions for the meanings of Monthly Income and Other Income Benefits.

### Article 3.A Calculation of Monthly Benefit Due to Partial Disability
If you are Partially Disabled and are currently earning less than 80% of your Indexed Pre-disability Earnings, the following calculation is, used to determine your Monthly Benefit:

$$(A \text{ divided by } B) \times C = D$$

where

A = Your Indexed Pre-disability Earnings less your Current Monthly Earnings.

B = Your Indexed Pre-disability Earnings.

C = The Monthly Benefit payable if you were otherwise Totally Disabled. (Disregard all other income from any employer or for any work when determining this figure.)

D = The Partial Disability payable.

If a Monthly Benefit is payable for less than a month, The Hartford will pay 1/30 of the Monthly Benefit for each day you were Disabled. This minimum Monthly Benefit payable will never be less than $50.00.



## BENEFITS

### Article 5. Survivor Income Benefit

If you die:

(1) after having met the Elimination Period shown in the Plan of insurance; or

(2) while receiving benefits under this Plan,

then a lump sum payment equal to 3 times the Monthly Benefit which:

(1) would have been paid to you; or

(2) was paid to you,

will be payable to your surviving Spouse.

If there is no surviving Spouse then benefits will be payable to your surviving children, in equal shares.

If there is no surviving Spouse or Child, no lump sum amount is payable.

If a minor Child is entitled to benefits, it is The Hartford's option to make benefit payments to the person caring for and supporting the Child until a legal guardian is appointed.

The following terms apply to Survivor Income Benefits:

(1) "Spouse" means your wife or husband who:

(a) is mentally competent; and

(b) was not legally separated from you at the time of your death.

(2) "Children" means your children, step-children, legally adopted children and foster children who, at the time of your death were:

(a) not yet 19 years old; or

(b) at least 19, but not yet 23; and

(i) attending school on a regular basis; and

(ii) dependent on you for financial support.

20

## EXCLUSIONS

### Exclusions

The plan does not cover and no benefit will be payable for any Disability which:

(1) is caused by your commission of or attempt to commit assault, battery, or felony;

(2) is due to:

(a) war;

(b) any act of war (declared or not);

(c) insurrection;

(d) rebellion; or

(e) your taking part in a riot or civil disorder; or

(3) is due to or contributed to by a Pre-existing Condition.

### Pre-existing Conditions Limitations

The following exception(s) will apply to Exclusion (3):

(1) Exclusion (3) will not apply if you become Disabled on or after the first to occur of the following dates:

(a) the last day of a Treatment Free Period which begins while insured and during which you did not receive Medical Care for the Pre-existing Condition; or

(b) the last day of a Period of Coverage during which you have been continuously insured under the Group Insurance Policy.

See the Plan of Insurance for the Treatment Free Period and Period of Coverage.

**This paragraph applies only if No Loss/No Gain is included in your Plan of Insurance.**

(2) If you:

(a) become insured under the Group Insurance Policy on the Policy Effective Date; and

(b) were insured under the long term disability insurance (here called the Prior Plan) carried by the Policyholder on the day before the Policy Effective Date;

then Exclusion (3) will cease to apply if you are Disabled due to or contributed by a Pre-existing Condition on the first to occur of the following dates:

(a) the Policy Effective Date, if your coverage for the Disability was not limited by a Pre-existing Condition restriction under the Prior Plan; or

(b) the date this restriction would have ceased to apply had the Prior Plan stayed in force.



21

## EXCLUSIONS

**Pre-existing Conditions Limitations (Continued)**

If Exclusion (3) does not apply or ceases to apply only because of the preceding terms of this Pre-existing Condition Limitation, benefit payments will be subject to both limitations below:

(a) No Monthly Benefit payment will exceed the lesser of the Monthly Benefit:

    (i) which would have been paid by the Prior Plan; or

    (ii) provided by this plan.

(b) No payment shall be made after the earlier to occur of:

    (i) the date payments would have ceased under the Prior Plan; or

    (ii) the date payments cease under this plan.

These exceptions will not apply to a period of Total Disability which commences on or after the earlier of the dates stated in item (1).



---

## GENERAL PROVISIONS

**Incontestability**

Except for non-payment of premium, the Group Insurance Policy can not be contested after two years from the Policy's Effective Date.

No statement made by a Covered Person relating to his or her insurability will be used to contest the insurance for which the statement was made after the insurance has been in force for two years during the Covered Person's lifetime. In order to be used, the statement must be in writing and signed by the Covered Person.

## CLAIMS

**Notice of Claim**

You must give The Hartford written notice of a claim within 20 days after the loss happens or starts. If notice cannot be given within that time, it must be given as soon as possible. Such notice must include your name, your address and the Policy number.

**Claim Forms**

When The Hartford receives a Notice of Claim, you will be sent forms for providing The Hartford with Proof of Loss. The Hartford will send these forms within 15 days after receiving a Notice of Claim. If The Hartford does not send the forms within 15 days, you may submit any other written proof which fully describes the nature and extent of your claim.

**Proof of Loss**

Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, The Hartford may require further written proof that you are still Disabled. If proof is not given by the time it is due, it will not affect the claim if:

(1) it was not possible to give proof within the required time; and

(2) proof is given as soon as possible; but

(3) not later than 1 year after it is due, unless you are not legally competent.

The Hartford has the right to require, as part of Proof of Loss:

(1) your signed statement identifying all Other Income Benefits; and

(2) proof satisfactory to The Hartford that you and your dependents have duly applied for all Other Income Benefits which are available.

## CLAIMS

**Proof of Loss (Continued)**

After submitting proof of loss, you will be required to apply for Social Security Disability benefits. If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider the denial and, to request a hearing before the Administrative Law Judge of the Office of Hearing and Appeals.

The Hartford reserves the right to determine if Proof of Loss is satisfactory.

You will not be required to claim any retirement benefits which you may only get on a reduced basis.

**Payment of Claims**

All payments are payable to you. Any payments owed at your death may be paid to your estate. If any payment is owed to your estate, a person who is a minor or a person who is not legally competent, then The Hartford may pay up to $1,000 to any of your relatives who is entitled to it in the opinion of The Hartford. Any such payment shall fulfill The Hartford's responsibility for the amount paid.

**Time Payment of Claims**

If written Proof of Loss is furnished, accrued benefits will be paid at the end of each month that you are Disabled. If payment for a part of a month is due at the end of the claim, it will be paid as soon as written Proof of Loss is received.

**Appeal of Claims Denied**

If a claim for benefits is wholly or partly denied, you will be furnished with written notification of the decision. This written decision will:

(1) give the specific reason(s) for the denial;

(2) make specific reference to the policy provisions on which the denial is based;

(3) provide a description of any additional information necessary to prepare a claim and an explanation of why it is necessary; and

(4) provide an explanation of the review procedure.

---

## CLAIMS

**Appeal of Claims Denied (Continued)**

On any denied claim, you or your representative may appeal to The Hartford for a full and fair review. You may:

(1) request a review upon written application within 60 days of the claim denial;

(2) review pertinent documents; and

(3) submit issues and documents in writing.

A decision will be made by The Hartford no more than 60 days after the receipt of the request, except in special circumstance (such as the need to hold a hearing), but in no case more than 120 days after the request for review is received. The written decision will include specific references to the policy provisions on which the decision is based.

**Legal Actions**

Legal action cannot be taken against The Hartford:

(1) sooner than 60 days after due Proof of Loss has been furnished; or

(2) after the shortest period allowed by the laws of the state where the Policy is delivered. Except as noted below, this is 3 years after the time written Proof of Loss is required to be furnished according to the terms of the Policy.

EXCEPTIONS:  Kansas — 5 years
S. Carolina — 6 years  } after the time written proof of loss is required to be furnished

Section VII

## CLAIMS

**Physical Examination**

The Hartford may have you examined to determine if you are Disabled. Any such examination will be:

(1) at The Hartford's expense; and
(2) as reasonably required by The Hartford.

**Subrogation**

If an Insured person:

(1) suffers a disability because of the act or omission of a Third Party; and

(2) becomes entitled to and is paid benefits under the Group Insurance Policy in compensation for lost wages; and

(3) does not initiate legal action for the recovery of such benefits from the Third Party in a reasonable period of time; then

The Hartford will be subrogated to any rights the Insured Person may have against the Third Party and may, at its option, bring legal action to recover any payments made by it in connection with the Disability.



26

---

The Following Important Notice is Provided by Your Employer for your Information Only.

**Conforming Instrument**

For the purpose of meeting certain requirements of the Employee Retirement Income Security Act of 1974, the following information and the attached Claim Procedures and Statement of ERISA Rights are provided for use with your booklet-certificate to form the Summary Plan Description.

The benefits described in your booklet are provided under a group policy by the Insurance Company and are subject to the terms and conditions of that policy.

A copy of this policy is available for your review during normal working hours in the office of the Plan Administrator.

1. **Plan Name**
   Group Long Term Disability Insurance Benefits.

2. **Plan Number**
   503

3. **Employer/Plan Sponsor**
   Medical Center of Delaware
   501 West 14th Street
   P.O. Box 1668
   Wilmington, DE 19899

4. **Employer Identification Number**
   51-0103684

5. **Type of Plan**
   Welfare Benefit Plan providing Long Term Disability benefits for Employees of Medical Center of Delaware.

6. **Plan Administrator**
   Same as Employer/Plan Sponsor in Item 3.



GR-10648-1H

27

7. ___ or Service of Legal Process

___ord Life and Accident Insurance Company
Hartford Plaza
Hartford, CT 06114

In addition to the above, Service of Legal Process may be made on a plan trustee or the plan administrator.

8. Sources of Contributions — The Employer pays the premium for the insurance, but may allocate part of the cost to the employee. The Employer determines the portion of the cost to be paid by the employee.

9. Type of Administration — The plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group policy.

10. The Plan and its records are kept on a Policy Year basis.

## Statement of ERISA Rights

You are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

(i) Examine, without charge, at the plan administrator's office and at other locations (worksites and union halls), all plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the plan with the U.S. Department of Labor, such as annual reports and plan descriptions.

(ii) Obtain copies of all plan documents and other plan information upon written request to the plan administrator. The administrator may make a reasonable charge for the copies.

(iii) Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary financial report.

28

T-GR-10646-2H

## Statement of ERISA Rights (Continued)

In addition to creating rights for plan participants, ERISA i___oses duties upon the people who are responsible for the operati___ the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a welfare benefit is denied in whole or in part you must receive a written explanation of the reason for the denial. You have the right to have the plan reviewed and reconsider your claim. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor Management Services Administration, Department of Labor.

## Claim Procedures

A. Claims for Benefits — An employee wishing to present a claim for benefits for himself or his insured dependents should obtain claim form or forms from his Employer or Administrator. The applicable section of such form or forms should be completed by (1) Employee, (2) Employer or Administrator and (3) Attending Physician or Hospital.

29

GR-10676-2H

Cor___ng Instrument
Cl___ ___rocedures (Continued)

Following completion, claim form or forms should be forwarded to the individual authorized to process and pay claims (Administrator or Insurance Company's Claim Representative). The individual authorized to process and pay the claims will compute benefits due, and will issue draft(s) in settlement. Unless the employee assigns benefits to a doctor or to a hospital, draft(s) will be made payable to the employee.

A decision will be made by the Insurance Company no more than 90 days after receipt of due proof of loss, except in special circumstances (such as the need to obtain further information), but in no case more than 180 days after the due proof of loss is received. The written decision will include specific reasons for the decision and specific references to the plan provisions on which the decision is based.

B.   Appealing Denial of Claims — If a claim for benefits is wholly or partially denied, notice of the decision shall be furnished to the employee. This written decision will:

(a)  give the specific reason or reasons for denial;

(b)  make specific reference to policy provisions on which the denial is based;

(c)  provide a description of any additional information necessary to prepare the claim and an explanation of why it is necessary; and

(d)  provide an explanation of the review procedure.

On any denied claim an employee or his representative may appeal to the Insurance Company for a full and fair review. The claimant may:

(a)  request a review upon written application within 60 days of receipt of claim denial;

(b)  review pertinent documents; and

(c)  submit issues and comments in writing.

A decision will be made by the Insurance Company no more than 60 days after receipt of the request for review, except in special circumstances (such as the need to hold a hearing), but in no case more than 120 days after the request for review is received. The written decision will include specific reasons for the decision and specific references to the plan provisions on which the decision is based.

30

GR-10676-3H

**Enter the values in the GREEN fields on either the Non-Ability or Ability chart below.**

*Note the comments on each field if you need instructions.

## NON-Ability Earnings Test Calculation

| | |
|---|---|
| Pre-Disability Earnings | |
| arnings Test Percentage | 60% |
| Monthly Any Occ Earnings Test (Full Time) | 0.6 |
| Hourly Any Occ Earnings Test (Full Time) | 0.00 |
| Number of hours Claimant can work per week | |
| Hourly Any Occ Earnings Test (Part Time) | #DIV/0! |

J. Chao-correction

## Ability Earnings Test Calculation

| | |
|---|---|
| [Indexed] Pre-Disability Earnings | 4513.6 |
| Earnings Test Percentage | 60% |
| Maximum Monthly Benefit | |
| Monthly Any Occ Earnings Test (Full Time) | 2708.16 |
| Hourly Any Occ Earnings Test (Full Time) | 15.62 |
| Number of hours Claimant can work per week | 32 |
| Hourly Any Occ Earnings Test (Part Time) | 19.53 |

### PRE 10-93 onlyIII  (7% version)
### Calculate Indexed Pre-Disability Earnings (PDE)

| Disability Date | PDE | First Index Due July of: | | Indexed PDE |
|---|---|---|---|---|
| | $0.00 | 1998 | 7.00% | $0.00 |
| | $0.00 | 1999 | 7.00% | $0.00 |
| | $0.00 | 1998 | 7.00% | $0.00 |
| | $0.00 | 1999 | 7.00% | $0.00 |
| | $0.00 | 2000 | 7.00% | $0.00 |
| | $0.00 | 2001 | 7.00% | $0.00 |
| | $0.00 | 2002 | 7.00% | $0.00 |
| | $0.00 | 2003 | 7.00% | $0.00 |
| | $0.00 | 2004 | 7.00% | $0.00 |
| | | 2005 | 7.00% | $0.00 |
| | | 2006 | 7.00% | $0.00 |

### POST 10-93 onlyIII
### Indexed Pre-Disability Earnings (PDE)   Calculate

| Disability Date | PDE | | | Indexed PDE |
|---|---|---|---|---|
| | $0.00 | January 2, 1994 | 2.80% | $0.00 |
| | $0.00 | January 2, 1994 | 2.80% | $0.00 |
| | $0.00 | January 2, 1994 | 2.60% | $0.00 |
| | $0.00 | January 2, 1994 | 3.50% | $0.00 |
| | $0.00 | January 2, 1994 | 3.20% | $0.00 |
| | $0.00 | January 2, 2000 | 3.30% | $0.00 |
| | $0.00 | January 2, 2001 | 2.60% | $0.00 |
| | $0.00 | January 2, 2012 | 4.30% | $0.00 |
| | $0.00 | January 2, 2013 | 2.00% | $0.00 |
| | $0.00 | January 2, 2000 | 3.20% | $0.00 |

# <u>Exhibit B</u>

*(Letter to Ms. Chao from Hartford wrongfully terminating benefits,
effective April 25, 2006)*



# Hartford Life

April 28, 2006

Jennifer Chao
2223 Naamans, Road
Wilmington, DE 19810

Policyholder:       Christiana Care Health System
Claimant:           Jennifer Chao
Policy Number:      GLT33229

Dear Ms. Chao:

We are writing to you regarding your claim for Long Term Disability (LTD) benefits insured under the above Hartford Life and Accident group policy. This LTD policy, Certificate of Insurance Policy GLT-33229 funds the Christiana Care Health System LTD Employee Benefits Plan. We have completed our review of your claim for continued benefits and have determined that you no longer meet the definition of Total Disability as defined in Christiana Care Health Care System policy GLT-33229. Accordingly, benefits beyond April 27, 2006 are not payable to you in accordance with the provisions of the policy and your claim will be terminated effective April 28, 2006.

Your policy states the following:

"The Hartford will pay benefits until the first to occur of:
    (1)    the date you are no longer Disabled;
    (2)    the date you fail to furnish proof that you are continuously Disabled;
    (3)    the date you refuse to be examined, if The Hartford requires an examination;
    (4)    the date you die; or
    (5)    the date determined by the Maximum Duration of Benefits Table.

Your policy also states the following:

"Totally Disabled means:
    (1)    during the Elimination Period; and
    (2)    for the next 60 months,

you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis. After that, and for as long as you remain Totally Disabled, you

Benefit Management Services
Chicago Disability Claim Office
P.O. Box 2046
Aurora, IL 60507-2046
Toll-Free 866-629-0734
Facsimile 860-392-3627

are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education or experience.

At this time we have based our decision to terminate your claim for continued benefits on the definition of Total Disability (as defined above) and all of the documents contained in your claim file, viewed as a whole, including the following specific information:

1)    Claimant questionnaire including work history and education completed by you in 1998.
2)    Various office notes covering the period 1995 through 2006 including records from: Dr. Daniel Skubick, Dr. David Estock, Dr. Ellen Feingold, Dr. Jeffrey Freedman and Dr. Robert Gerwin.
3)    Your interview with, statements to and observations made by the Hartford's Investigator Gary Harrison on 01/06/2006.
4)    Response from Dr. Freedman received on 02/24/2006.
5)    Functional Capacity Evaluation completed 02/26/2006.
6)    Surveillance by our representative vendor on 11/16-11/17/2005 and 02/26-02/28/2006.
7)    Phone conversation with Dr. Shaun Maas office on 03/08/2006.
8)    Response from Dr. Feingold dated 03/10/2006.
9)    Documented phone conversation with Dr. Estock on 04/04/2006.
10)   Documented phone conversation with Dr. Feingold on 04/04/2006.
11)   Independent medical report from Dr. George Kazda of the Medical Advisory Group completed on 04/05/2006.
12)   Employability Analysis Report completed by the Rehabilitation Case Manager for the Hartford dated 04/18/2006.

You last worked for your employer on September 06, 1995 due to the development of back, bilateral hip, bilateral leg and ankle pain as well as foot numbness. In June 1995 you developed right leg pain with symptoms progressing to your lower extremities with pain and numbness. At that time you underwent multiple imaging studies which failed to show any abnormalities. Your current diagnoses are listed as fibromyalgia and chronic pain syndrome with depression, anxiety and panic attacks. Medical records from 1995 through 2006 have been reviewed including records from your most recent treating physicians: Dr. Daniel Skubick, neurology; Dr. David Estock, family medicine; Dr Ellen Feingold, homoeopath; Dr. Robert Gerwin, neurology; and Dr. Jeffrey Freedman, physiatrist.

In 1999 diagnostic findings showed that you had mild S1 radiculopathy but there were no other findings to explain your complaints of pain. You were found to have some psychological issues that needed to be addressed therefore psychotherapy and nonspecific therapy was recommended and it appears that you were under the care of Dr. Lynn Hagelin until 2004 when your care was handled by Dr. Scott Houser, psychiatry.

In 2004 you were referred to the headache and pain center for an evaluation due to your long history of back and buttock pain. It was noted that several MRIs of the back have all been negative. Multiple trials of treatment did not produce improvement. In August 2004 a nerve block in the lumbar region resolved the pain for a few hours and you showed some improvement. In November 2004 you received a Botox injection but this lead to the development of urinary incontinence. You were referred to see the doctor at the pain center on two occasions but you canceled your visits. Your medications include on Oxycontin with reasonable control of your pain along with Vioxx, Flexeril and Provigil.

Page 3
04/28/06

Your records note that you sought psychiatric care with Dr. Houser and your medication included Prozac, Wellbutrin, Atrovent and Sonata. Medical records were requested from Dr. Houser but to date we have not received a response.

In June 2005 you were evaluated by Dr. Gerwin who indicated on exam that you were in no acute distress, you were oriented x3, bright and cheerful but began to cry towards the end of your visit. Your neurological exam was normal, motor strength was 5/5 which is considered normal. There was evidence of scoliosis of the left hip and shoulder, both higher than the right side and exaggerated lumbar lordosis. The musculoskeletal exam showed full range of motion of the neck and lumber spine. Dr. Gerwin noted myofascial trigger points in several areas and his final diagnosis was myalgia, with secondary diagnosis of hypermobility syndrome and chronic fatigue syndrome. Dr. Gerwin noted the presence of sleep disorder which he thought was a factor in your persistent pain and suggested further evaluation. He recommended a combination of myofascial trigger point inactivation, strengthening with a gradual approach and PT for treatment of hypermobility syndrome.

In reviewing your claim we noted your self reported complaints were severe with chronic pain that limits all movement however you indicated on your claimant questionnaire in April 2004 that you still take ski trips to Colorado with your family. In a phone conversation with the Hartford in October 2005 you indicated you drive your son to school, walk short distances and use a cane when you are out of the house. Your stated activities and your medical complaints showed some inconsistencies therefore we performed surveillance as a part of our investigation. On January 06, 2006 Investigator Gary Harrison conducted an interview with you and at that time you were notified that you had been the subject of surveillance and you were shown the surveillance. You were also identified as the person in the February 2006 surveillance.

During the interview you were asked to describe the symptoms and medical conditions that prevent you from returning to work in any occupation. In your interview your responses were transcribed by Inv. Harrison and put into statements which you were given the opportunity to review and correct. Inv. Harrison's observations are also included in the analysis.

You relayed that "...The disabling medical condition(s) that prevent me from returning to work are: unpredictable periods of pain with unpredictable levels of intensity lasting from 1 day to a month; I'm on a lot of narcotics; and I have concentration issues due to intense pain...My symptoms include a sensitivity to touch around my buttock, which developed during my fifth month of pregnancy; sciatic pain resulting in intense pain in my feet; anxiety; a lack of energy; and extreme muscle fatigue the day after repetitive use of a particular muscle group...The medical tests that have been performed include steroid epidurals; SI block with steroids; CAT scans; multiple MRI's; Botox injections; and a number of tests to rule out various medical conditions....".

During the interview you indicated that you were capable of performing the following tasks up to the time limit specified before you would need to rest due an increase in pain. If you exceed the time limits you specified your pain level would increase from a level of 4 to a level of 9, with 0 equaling no pain and 10 equaling extreme pain. You relayed you could walk for up to 10 minutes; shop for up to 2 hours; stand for up to 10 minutes; lift and carry up to 30 pounds; bend and twist; squat, with some pain; push and pull items that offer resistance; reach at all levels; traverse stairs but going down stairs multiple times increases your pain; maintain your balance; use your hands for writing and typing; sit for up to 30 minutes; use a computer with a limited level of knowledge; and drive for up to 60 minutes.

Inv. Harrison observed you during the interview. His observations include but are not limited to the following: that during the interview you were cooperative, attentive and responsive to questions asked of you. In his opinion, your thoughts and speech were logical and you appeared to possess the ability to concentrate adequately, understand his questions and instructions, and articulate your answers during the three and one half hour meeting. Further, you were able to review your statement and/or other documents, analyze the sentences and rationalize any necessary changes or modifications. Inv. Harrison noted that you mentioned that you have difficulty with short-term memory but you were able to call him by name at 11:47 AM about an hour and a half after last using his name. He noted that you displayed no lapses in memory when recalling medical information or dates.

He observed that you walked and moved throughout your home without any overt limitations or restrictions and that your movements appeared fluid and smooth. You were observed pushing, pulling and tugging on your full-grown Golden Retriever. Inv. Harrison noted that while you were on the couch you had the strength to repeatedly push your dog off, approximately three hours into the interview. Inv. Harrison observed that the dog seen at the interview appeared to be the same dog observed in the surveillance. The dog appears full grown weighing approximately 65 pounds and stands approximately 22 inches at the withers.

He observed you twisting at the waist, reaching for items such as your wallet and bending under the table to push/pull your dog out of the way. You moved from a sitting position in a straight-backed wooden kitchen chair, using a pillow for padding to sitting on a couch with your legs elevated and stretched out to the left. Inv. Harrison observed that you got up and down in one fluid motion from a seated to a standing position six times throughout the interview process. He observed that you sat cross-legged near the front edge of the couch for 10-15 minutes and got up to demonstrate your level of flexibility by bending over and touching the floor with your palms while maintaining a straight-legged posture.

In a second statement made after you viewed the November surveillance you stated ""...My actual restrictions and limitations are best represented in my filmed activities and my first statement...The surveillance video accurately depicts my current level of functionality and accurately shows my current level of restrictions and limitations, four days out of a week...".

You were observed on November 16 and November 17, 2005 and on February 26, February 27, and February 28, 2006. During the surveillance, (except on November 17, 2005 and February 26, 2006 when you were not seen), you were observed walking over even and uneven ground; up incline surfaces; standing, sitting, twisting, reaching at all levels; using all of your extremities carrying items such as a gallon water jug and a musical instrument case driving, lifting, pushing/pulling, bending, squatting; playing with yours and other dogs at a dog park; and conversing with fellow patrons of the park. In the films you did not appear to have any

observable difficulty in maintaining your balance, upright posture or an inability to walk up or down curbs and sidewalks.

A copy of the November investigative material was sent for review and comment to Dr. Estock, Dr. Feingold, Dr. Freedman and Dr. Shaun Maas who you indicated in your interview was your chiropractor.   In addition to the investigative material your physicians were asked if they agreed you were capable of performing light level of work with the following restrictions and limitations: has the ability to stand and/or walking longer than 2 to 3 hours at a time without the ability to change positions; the ability to perform occasional sitting (1-2 hours total per workday); no repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs, twisting or turning;  ability to perform lifting, carrying, pushing or pulling up to 20 pounds occasionally and up to 10 pounds frequently; can perform frequent to constant fingering, feeling and/or handling (bilateral upper extremities).

They were also asked if they agreed that you were capable of performing medium level of work with the following restrictions and limitations: has the ability to stand and/or walking constantly; the ability to perform occasional sitting (1-2 hours total per workday); no repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs, twisting or turning; ability to perform lifting, carrying, pushing or pulling up to 20-50 pounds occasionally, 10-25 pounds frequently and up to 10 pounds constantly;  can perform frequent to constant fingering, feeling and/or handling (bilateral upper extremities).

In addition a copy of the investigative material and request for medical information including a narrative report to address your psychiatric issues was sent to Dr. Houser.  To date Dr. Houser has not provided a response or any medical records.

Dr. Freedman returned the response indicating "I have not and do not anticipate being involved in this aspect of Ms. Chao's care." Dr. Maas indicated that he deferred his opinion to Dr. Estock. Dr. Estock ordered a Functional Capacity Evaluation (FCE) rather than providing a response which you completed on February 27, 2006.

The result of the FCE was noted to be a "conditionally valid representation" of your physical capabilities. It was noted results identified in the assessment of the functional overview generally represented your "perceived current capability level." The report stated "though this client may actually be able to physically and functionally, she terminated activities early, prior to reaching full capacity. The client believes that functioning beyond these perceived levels may increase their symptom/discomfort levels." Despite the limitations the FCE suggested that you were capable of sedentary/light work part time. It was recommended that you could work part time 4-5 hours per day at sedentary to light occupational levels primarily in a seated position with ability to frequently change positions between sit, stand and walk.

Dr. Feingold reviewed the FCE and our letter and opined it was extremely unlikely that you would be able to work in your profession of nursing due to medications you are taking to control your pain. She doubted that you would be able to work in any nursing capacity even one without drug testing as a prerequisite because of the physical effort involved in working with patients. Dr. Feingold noted that you suffer from frequent, but inconstant, cloudy mental functioning and recent memory deficits probably as a result of taking Wellbutrin and Effexor.

During the February surveillance on the day you attended your FCE you were seen leaving the exam using your cane. The video surveillance documents your ability to walk with and without a cane. In the January interview you relayed that you use a cane about "…40% of the time, more in

the afternoon as I fatigue…a lack of energy and extreme muscle fatigue the day after repetitive use of a particular muscle group…". During the surveillance periods the only time you are seen with a cane is immediately after the FCE.

The FCE tested your ability to use muscle groups repetitively. In your interview you stated you suffer from lack of energy and extreme muscle fatigue the day after repetitive use of a particular muscle group. During the afternoon following the morning FCE, you were observed performing the tasks described above repetitively using muscle groups including walking with no hesitations, restrictions or limitations and without using a cane.

During the total surveillance the only time we observed you display any type of hesitation or restriction/limitation was immediately following the FCE. Without this single instance your ability to perform the described tasks above appear to be unrestricted and fluid. Throughout the observation periods there are no visible indications that would suggest you were in any discomfort or that you altered your physical movements secondary to any discomfort. Also during the surveillance periods, you exhibited no outward restrictions in body movements nor were there any observed pain behaviors, exertional limitations or apparent issues with focus or concentration.

In order to give your claim full consideration your medical records were reviewed by Dr. George Kazda, an independent medical consultant with the Medical Advisory Group (MAG). As part of his review, Dr. Kazda discussed his medical findings with Dr. Estock and Dr. Feingold on April 04, 2006. During Dr. Kazda's conversation with Dr. Estock, it was stated that there was a lack of any specific diagnostic findings in Dr. Estock's records aside from elevated lipids. Dr. Estock confirmed this information. He stated that his assessment of you was based primarily on your reported limitations as well as the FCE you recently completed. Dr. Estock was asked about any specific psychiatric/psychological assessments and he stated that you were evaluated by Dr. Houser in the past. Dr. Estock noted that you were not involved in any active form of therapy but you received some form of massage and manipulation on an intermittent basis. He was asked if he had the occasion to review the video surveillance obtained by the Hartford. He stated that he received the information however he had not had a chance to review it. Dr. Estock was advised of the discrepancies between your reported limitations and those found on surveillance.

Dr. Feingold also indicated that she received the investigative materials and had not reviewed the material. She confirmed there have been no abnormal diagnostic findings on MRI, CT scan or any other studies to document your pain complaints. Dr. Feingold felt that you were able to work but recommended employment at the level of 4 hours per day. Dr. Feingold noted that you complained of mental clouding with some issues related to memory problems. Dr. Feingold was asked if a formal neuropsychological evaluation was performed and she indicated to her knowledge that an evaluation was not previously obtained.

After reviewing the medical information and his conversation with your physicians, Dr. Kazda has opined that you have the physical capacity to return to work at the medium, light and sedentary levels on a full time basis. He noted there is no information apart from your complaints which were inconsistent with the observations during the surveillance. It was noted that you are capable of carrying out tasks of daily living, run errands, shop and travel. Dr. Kazda noted that it was likely that deconditioning was playing a significant role in your physical capacity and limitations. Your records suggest that there are ongoing issues with depression, anxiety and panic attacks however there are no records from your psychiatrist to document the severity of these issues. Despite complaints that your mental status is compromised, there are no neuropsychological evaluations to address how you may be cognitively impaired. In addition as

previously stated during the interview you displayed no lapses in memory and you were able to recall dates, names, medical information, etc.

In summary, both Dr. Feingold and Dr. Estock were afforded the opportunity to review the investigative materials to provide additional comments however they both stated they had not reviewed the materials. Although the FCE indicated that you were capable of working 4-5 hours per day it was noted the results were conditionally valid due to your self-limiting behaviors. Dr. Feingold indicated that you were only able to work 4 hours per day but based her opinion on your self-reported complaints and not on any specific diagnostic findings and never reviewed the materials which document your activities. Dr. Estock did not provide any comments regarding your ability to work only stated his assessment of you was based primarily on your self-reported limitations.

Based on the opinion of Dr. Kazda, the lack of any supporting diagnostic findings to explain your complaints of pain and the investigative materials we have concluded that you have the capacity to return to work at the light, medium and sedentary levels therefore your file was reviewed by the Hartford's Rehabilitation Case Manager to determined if there were any occupations that your are capable of performing in the national economy based on your current restriction/limitations, education and previous work history. An Employability Analysis Report was completed.

Your transferable skills include: knowledge of medical terminology, patient care procedures, taking vital signs, drawing blood, knowledge of medical conditions and treatment protocols, knowledge of medications, knowledge of all aspects of giving anesthesia, placement of IVs, operating anesthesia equipment, chart documentation, operate and monitor hospital medical equipment, physical assessment skills and interpreting lab values and operating medical equipment.

The report identified four occupations that appeared appropriate for you given your work history, education and physical abilities. The occupations are as follows:

1. Cardiac monitor Technician
2. Nurse, General Duty
3. Nurse, Office
4. Surgical Technician

The above occupations were directly transferable and performed at the sedentary, light and medium work levels. This is only a partial list of occupations identified and is not meant to represent all occupations you are capable of performing based on your education, training and experience.

Based on your medical findings, the opinion provided by Dr. Kazda, the surveillance and the vocational assessment, the Hartford has determined that all the evidence obtained and listed above, supports that you no longer meet the definition of disability as defined in your policy therefore your claim has been terminated.

The Employee Retirement Income Security Act of 1974 ("ERISA") gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send to us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180)

Page 8
04/28/06

days from the date of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Please send your appeal letter to:

>Valarie Stroud, Claim Specialist
>Benefit Management Services
>Chicago Disability Claim Office
>P.O. Box 2046
>Aurora, IL 60507-2046

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

If you have any questions and/or concerns regarding this decision, please do not hesitate to contact me at 1-866-629-0734 x28802.

Sincerely,

Valarie Stroud
Claim Specialist
The Hartford Life Insurance Company

Cc: Christiana Care Health System

2 North LaSalle
Suite 2600
Chicago, Ill.
60602

# Exhibit C

*(Appeal of wrongful termination of benefits filed by Ms. Chao on October 19, 2006)*

# OBERLY, JENNINGS & RHODUNDA, P.A.

### 1220 Market Street – Suite 710
### P. O. Box 2054
### Wilmington, Delaware 19899

Charles M. Oberly, III
Kathleen M. Jennings
William J. Rhodunda, Jr.
——
Karen V. Sullivan

(302) 576-2000
Fax (302) 576-2004
E.I.No. 51-0364261
Writer's e-mail wrhodunda@ojlaw.com

October 19, 2006

Ms. Valerie Stroud, Claim Specialist
Benefit Management Services
Chicago Disability Claim Office
2 North LaSalle, Suite 2600
Chicago, IL 60602

RE:    Claimant:  Jennifer Chao
       Policyholder: Christiana Care Health System
       Insurer:  Hartford Life and Accident
       Policy Number:  Certificate of Insurance Policy GLT33229

Dear Ms. Stroud:

Please accept this letter on behalf of my client Jennifer Chao. I am writing to formally appeal Hartford Life's decision that she no longer meets the definition of total disability as defined in Christiana Care Health System Policy GLT – 33229, that her claim for Waiver of Premium benefits under the policy be discontinued, and that her Long-Term Disability (LTD) benefits insured under the policy be discontinued. After reviewing the enclosed materials, I am confident that Harford Life's decision to deny future benefits will be reversed and that Ms. Chao will be made whole and that her benefits will be restored. As you may recall, you handled a matter involving another client of mine that was amicably resolved, and I trust that your office will give careful consideration to the enclosed information. I am hopeful that we can resolve this matter without litigation, but we believe there are important entitlements at stake and we will take all necessary action to restore those entitlements.

This appeal is being filed in response to your letters dated April 28, 2006 and May 3, 2006 pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), which permits Ms. Chao to appeal and receive a full and fair review of the prior decision. As stated in your letters, Ms. Chao is entitled to her benefits so long as she cannot maintain full-time employment in her prior profession. Based on the chronic nature of Ms. Chao's symptoms, prescribed medication and associated depression, it is clear Ms. Chao cannot return to work in a full-time capacity.

Valerie Stroud
October 19, 2006
Page Two

I am fully aware of the investigation completed by Hartford Life, including the use of private investigators and surveillance. It would be shortsighted to base a decision in this case on brief snapshots of Ms. Chao's condition. The limited nature of the investigation does not reflect the reality of the severity of her condition and her clear inability to work in a full-time capacity.

The attached documents portray a person who has been severely victimized by long-term chronic pain and associated depression. In addition, her ability to work in her profession is obviously compromised by significant levels of prescribed narcotics and other medications. At this point, Ms. Chao has no choice but to accept the possibility that her condition may be permanent and that she has to continue to cope with the constant pain, associated depression and the impact of the prescribed medication. Ms. Chao's goal is to return to work when her symptoms and medication permit her to return to her profession. There is absolutely nothing in the record that indicates unwillingness by Ms. Chao to return to work when she is able.

In order to permit you to fully and fairly review this matter, I have enclosed the following documents, which I further describe below, for your consideration:

1.  Executive Summary of Ms. Chao's medical history with reference to applicable portions of her medical records and reports;
2.  A Memorandum of Law that identifies the legal issues to consider and the relevant case law; and
3.  Letters from people who interact with Ms. Chao on a regular basis and who have provided a complete picture of the impact of Ms. Chao's condition and the impact on her daily life. We believe that these individuals, as well as Ms. Chao's health providers, corroborate her statements and, more importantly her credibility regarding her condition and her inability to work on a full-time basis. Ms. Chao has been honest when reporting all her symptoms and limitations. We are not contending that she is bedridden. Although she can handle some day to day activities, she suffers from an unpredictable debilitating condition that varies dramatically in severity, and includes periods of time of almost total incapacitation. Her daily activities are dictated by the disease.

I urge you to review the Memorandum of Law prior to reviewing the medical records and the letters from people who are familiar with Ms. Chao's life activities. As you are aware, the policy remains in effect so long as Ms. Chao is totally disabled and unable to maintain full-time employment. Due to her medical condition and the extensive amount of medication she has been prescribed, Ms. Chao is clearly not able to work in a full-time position. Although fibromyalgia is a complex condition, and has been described as somewhat of a mysterious disease, there can be no dispute that Ms. Chao has been diagnosed and still suffers with this condition. This diagnosis has been confirmed by various medical doctors over the years, as have the limitations that have been placed on her due to her condition and the impact of her medications. In our Legal Memorandum, we address the issue related to the fact that persons with this condition may

Valerie Stroud
October 19, 2006
Page Three

have "good" days and "bad" days. During the period of surveillance, she was able to handle daily activities on some days and on other days she did not leave the house, or even get out of bed, which would obviously not be reflected based on the surveillance conducted. Although the video surveillance may show "good" day activity, this surveillance cannot possibly convey the extent of pain felt by Ms. Chao or the impact of the medication that she was taking. In addition, the activities videotaped only depict a very limited time period, which does not translate into her being able to work a full-time position. Our Legal Memorandum establishes that Hartford Life has to prove that Ms. Chao can work in a full-time capacity with the burdens of her condition and the associated prescribed medication. A review of the Executive Summary which outlines Ms. Chao's medical history and the letters from people who have regular and direct contact with her clearly requires a reversal of Hartford Life's decision to deny her benefits under the LTD policy.

As indicated above, the Executive Summary outlines Ms. Chao's medical history and references specific medical records for your consideration. It is apparent that Ms. Chao has suffered extreme chronic pain since 1994 and depression from the debilitating pain since 1995. The records, which speak for themselves, detail the history and the extensive amount of medication prescribed for her condition. It is no surprise that Ms. Chao suffers from depression due to the life altering impact of suffering from fibromyalgia. I have enclosed records that you may not have reviewed in the past from Dr. Houser, her treating psychiatrist for over two years. Dr. Houser indicates that her depression stems from fibromyalgia and associated issues because of the limitations on her ability to function at work and at home. There is no evidence whatsoever that her medical complaints are in any way caused by an underlying psychological condition.

We look forward to your review of this matter and certainly would be happy to provide any additional information that you may need to consider the appeal in this case. Do not hesitate to contact me if you have any questions regarding this matter.

Very truly yours,

WILLIAM J. RHODUNDA, JR.

Enclosures
cc:    Ms. Tina Sekorski, Appeals Unit, HCAFA
       Ms. Kim L. Gabrielson, Investigative Specialist, HCAFA
       Jennifer Chao

# OBERLY, JENNINGS & RHODUNDA, P.A.

**1220 Market Street – Suite 710**
**P. O. Box 2054**
**Wilmington, Delaware 19899**

Charles M. Oberly, III
Kathleen M. Jennings
William J. Rhodunda, Jr.
―――――――
Karen V. Sullivan

(302) 576-2000
Fax (302) 576-2004
E.I.No. 51-0364261
Writer's e-mail wrhodunda@ojlaw.com

October 20, 2006

**VIA FAX:  860-392-3627**

Ms. Valerie Stroud, Claim Specialist
Benefit Management Services
Chicago Disability Claim Office
2 North LaSalle, Suite 2600
Chicago, IL 60602

> RE:    Claimant:  Jennifer Chao
> Policyholder: Christiana Care Health System
> Insurer:  Hartford Life and Accident
> <u>Policy Number:  Certificate of Insurance Policy GLT33229</u>

Dear Ms. Stroud:

In reference to the above appeal, enclosed please find the following documents to be added and/or replaced in Claimant's appeal documents.

1. Character letters from Min Chao and Chad Danner to be added;
2. A corrected Executive Summary to replace prior summary.

We are also forwarding these 3-hold documents to you to be placed in the bound copy we previously sent you.

If I can be of any further assistance, please do not hesitate to contact me.

Very truly yours,

WILLIAM J. RHODUNDA, JR.

WJR,Jr./jdd
Enclosures
cc:    Ms. Tina Sekorski, Appeals Unit, HCAFA (Via Fax:  860-843-7272)
Ms. Kim L. Gabrielson, Investigative Specialist, HCAFA (Via Fax:  860-392-6697)
Jennifer Chao

# MEMORANDUM OF LAW

**MEMORANDUM OF LAW**
CHAO APPEAL

I.   **THE PLAN**

Medical Center of Delaware Group Benefits Plan October 1993:

- Policy terms: if under 60 and proof of disability provided to Hartford within year after last day of work, Hartford will pay long term disability insurance and waive premiums;

- means a disability caused by sickness which has existed continuously for nine (9) months and

- Total Disability means that: "[for the first five years] you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis. After that, and **for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education, or experience.**" Pg. 5  (emphasis supplied)

- Termination will occur is you are no longer Totally Disabled and return to work in a class of persons eligible for this insurance.

II.  **BURDEN OF PROOF: HARTFORD MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE CLAIMANT CAN WORK FULL-TIME IN ANY OCCUPATION WHEN THE PLAN IS SILENT ON THAT POINT.**

*Legal Issue: Whether the insurer must to prove by a preponderance of the evidence that the claimant can work full-time in any occupation when the plan is silent on that point.*

*Answer: Where the plan is silent and makes no distinction between part-time and full-time work, courts have construed such ambiguities against the drafter and require the insurer to prove by a preponderance of the evidence that the claimant can work full-time in any occupation*

Where the provisions in the plan are silent on how many hours the insured must be able to work to be rendered ineligible for long term disability benefits (i.e. part or full-time), such provisions have been deemed by the courts as ambiguous, and hence, resolved against the drafter-insurer. *Sloan v. Hartford Life and Acc. Ins. Co.*, 433 F.Supp.2d 1037 (D.ND 8th Cir. 2006). After considering the exact language in the case *sub judice*, the Court found as a matter of law that the phrase used by Hartford "prevented by Disability from doing any occupation" should be construed to include only other full-time employment. *Id.* "The ambiguity in question is construed against the drafter, yet consistent with the manner in which a reasonable person under the LTD Plan would have understood the phrase." *Id*; See also *Bruce v. New York Life Ins. Co.*, 2003 WL 21005313 (N.D.Cal. 2003) (If LTD silent as to whether return to work to "another occupation in which he could reasonably be expected to perform satisfactorily," had to be part-time or full-time, and if claimant had previously worked full-time before becoming disabled[1], such phrase would ordinarily be understood to mean "another full-time occupation.")

---

[1] Note: due to disability, Claimant in the instant case had curtailed her hours from 80 hours bi-weekly to 64 hours biweekly for approximately a year before being deemed unable to work. Part-time employees (work at a minimum 60 hours biweekly) are entitled to LTD benefits equivalent to 65% of their part-time salary.

Although distinguishable, several courts have construed such provisions to include part-time employment. *See Bond v. Cerner Corp.*, 309 F.3d 1064, 1067 (8th Cir.2002) (policy specifically distinguished between being able to do part-time and full-time work); *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 186 (1st Cir.1998) (in addition to being 'totally disabled' the policy required that defendant be '**completely prevented**' from engaging in any occupation) ; *Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 706 (11th Cir.1995) (policy for part-time employees permitted only disability payments for inability to perform such part-time work or part-time employees who subsequently became disabled would receive windfall); *Shane v. Albertson's Inc. Employees' Disability Plan*, 381 F.Supp.2d 1196, 1203-06 (C.D.Cal.2005) (policy defined "total disability" as "the **complete inability** of the employee to perform any and every duty of any gainful occupation," contemplated part-time work); *Sweno v. Liberty Life Assurance Co.*, No. CIV02-376, 2003 WL 1572006, *4 (D.Minn, Mar. 10, 2003) (policy language "unable to perform with "**reasonable continuity**" all of the material and substantial duties of his own or any other occupation" contemplated part-time work); *Hotaling v. Teachers Ins. & Annuity Ass'n of America*, 62 F.Supp.2d 731, 739-40 (N.D.N.Y.1999) (where defendant had the ability to perform at the "light" level and work on a part-time basis she was not "**completely unable**" ⋯ to perform [her] normal occupation.").

Because Claimant's policy does not specify that she be 'completely prevented' or 'completely unable' to do any work, or that she be able to perform any work with 'reasonable continuity', terms which courts have concluded contemplated part-time work, such cases are not applicable. Because the plan is silent on the point, in accordance with *Sloan* and *Bruce, supra,* Hartford must establish by preponderance of the evidence that the claimant can work full-time in any occupation.

## II.     CLAIMANT'S ABILITY TO PERFORM CERTAIN TASKS ON "GOOD" DAYS IS NOT INDICATIVE OF HER ABILITY TO WORK FULL-TIME CONSIDERING HER DIMINISHED CAPACITY ON "BAD" DAYS.

*Legal Issue: Whether the claimant's ability to walk, drive a car, and run errands on "good" days establishes by a preponderance of the evidence that claimant is able to work full-time.*

*Answer: Claimant's ability to perform certain tasks on "good" days is not indicative of her ability to work full-time considering her diminished capacity on "bad" days.*

[F]ibromyalgia, "also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character-- multiple tender spots...."

*Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir.1996)).

*Sloan v. Hartford Life and Acc. Ins. Co.*, 433 F.Supp.2d 1037 (D.ND 2006) (Evidence that employee had not engaged in full-time employment for nearly 20 years after injuring his back and neck at work, suffered from chronic and debilitating neck pain, severe headaches, and insomnia, and was only able to work on "good" days was sufficient to establish that he was totally disabled

within meaning of his employer's long-term disability policy, despite evidence that he was able to drive, wash dishes, mow the lawn, shop, and perform other light maintenance around the house and on his automobiles).

*Speciale v. Blue Cross and Blue Shield Ass'n*, 425 F.Supp.2d 917 (N.D.Ill.,2006) (Plan administrator's rejection of claim for benefits under ERISA long term disability (LTD) plan was downright unreasonable, even though plan's medical consultant found, after reviewing plan participant's medical file and conferring with one treating physician, that there were no absolute confirmatory findings to support treating physicians' diagnosis of fibromyalgia, just subjective complaints, and test of multiple sclerosis (MS) was negative, where administrator's review committee failed to address one treating physician's written residual functional capacity questionnaire and conclusion of three out of four treating physicians that she was disabled.)

*Green v. Prudential Ins. Co. of America*, 383 F.Supp.2d 980 (M.D.Tenn.,2005) (In evaluating a claim for long term disability (LTD) benefits due to fibromyalgia, it was unreasonable for ERISA plan administrator to not require an independent psychiatric evaluation of plan participant; administrator never engaged a psychiatrist to complete an examination recommended by its hired experts despite a finding of disability by participant's two treating physicians and evidence of psychiatric impairment in the record.)

*Giannone v. Metropolitan Life Ins. Co.*311 F.Supp.2d 168 (D.Mass.,2004) (Plan administrator and insurer's determination that participant in ERISA plan was not entitled to continued long-term disability benefits for fibromyalgia and chronic fatigue syndrome was abuse of discretion, as it was not supported by substantial evidence under either de novo or arbitrary and capricious standard of review, when based on opinion of independent medical examiner who did not address issue of disability or participant's capacity for work, but primarily relied on eight-year-old report of non-examining physician who speculated that participant's symptoms might be psychosomatic, when examiner's opinion was weighed against fifteen-year medical history and uniform opinion of a half-dozen treating physicians, and insurer's own investigator, that participant's complaints were genuine.)

*Morgan v. UNUM Life Ins. Co. of America*, 346 F.3d 1173 (C.A.8 Minn.2003) (Substantial evidence did not support ERISA plan administrator's decision to discontinue long-term disability benefits awarded on account of employee's insomnia and fibromyalgia; investigator's surveillance showing employee driving his car, eating lunch at restaurant, carrying light objects, sitting and reading, and stretching and doing light aerobic exercise at gym for forty-five minutes revealed nothing new, in-house physician's opinion that employee's activities shown on surveillance footage were incompatible with fibromyalgic impairment was directly contrary to opinions of two primary treating physicians and at best tangentially relevant to employee's disabling cognitive deficits, psychologist's opinion that employee was not disabled was known to administrator at time of its initial determination, opinion of neuropsychologist who evaluated employee after discontinuation of benefits would be disregarded, and critique of that evaluation by administrator's own neuropsychologist was extraneous).

*Conrad v. Continental Cas. Co.*, 232 F.Supp.2d 600 (E.D.N.C.,2002) (ERISA plan administrator's decision to deny long term disability coverage to claimant diagnosed with fibromyalgia was unreasonable based on medical record and language of employee welfare plan; though claimant was not able to give test results which conclusively established fibromyalgia, she presented objective evidence of her disability, producing three physicians who confirmed the diagnosis, two of whom stated in their medical findings that claimant was not able to perform

3

normal daily functions, and treating physician reexamined claimant just prior to writing letter detailing her disability).

*Brown v. Continental Cas. Co.*, 2004 WL 2188085 (E.D.Pa.,2004) (While ERISA plan administrator may sometimes impose requirement for objective medical evidence that does not appear explicitly in plan's terms, it is unreasonable to do so in case of disease with lack of objectively-proven physical impairments or defects, such as fibromyalgia).

*Stup v. UNUM Life Ins. Co. of America*, 390 F.3d 301 (C.A.4 Md.,2004) (Finding of ERISA plan administrator that beneficiary with lupus erythematosus and fibromyalgia was able to perform sedentary work, and thus, was not eligible for long-term disability benefits was not supported by substantial evidence; although physical therapist and plan's doctor expressed that beneficiary's efforts during examination were purposefully inconsistent, there was overwhelming medical evidence that she suffered fatigue and memory loss, that she had low back pain radiating down her legs, that she could not use her hands for more than simple grasping, and that her ability to lift, carry, push, or pull was severely limited).

*Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, (C.A.7 Ill.,2003). (Denial of application for long-term disability benefits under welfare plan governed by ERISA was unreasonable, as required for reversal in light of discretion vested in plan administrator to grant or deny applications for benefits, inasmuch as the record contained nothing more than scraps to offset evidence presented by beneficiary and his treating physician to show that his fibromyalgia was totally disabling under plan's terms.)

*See also: O'Donnell v. Barnhart*, 318 F.3d 811 (C.A.8 Mo.,2003):

In some cases, a claimant's failure to follow prescribed treatment may undermine her credibility. (citation omitted). This does not appear to be such a case. Although in 1995 and 1996, Dr. Schoolman recommended psychotherapy, which O'Donnell declined, at the hearing she explained she did not seek psychotherapy because she believed the origin of her pain was physical. Her belief was confirmed by her actions in seeing numerous doctors and undergoing an extensive evaluation at the Mayo Clinic. Her belief was also confirmed by the opinion of Dr. Morrison, the consulting psychiatrist, who found no evidence of a psychiatric disorder. . . . The ALJ also did not believe her subjective allegations of disabling pain because she had not stopped smoking and had not lost weight. Given the evidence of her attempts to alleviate pain through medication, physical therapy, trigger point injections, nerve epidural blocks, and electrical stimulation, her failure to stop smoking and lose weight do not show that her complaints were not credible. (citation omitted). In any event, in 1998 she used a patch to help her stop smoking and Dr. Abrams reported that she had reduced her smoking significantly, but that her complaints continued. As to her failure to lose weight, this court has noted that a failure to lose weight is not necessarily inconsistent with allegations of disabling pain because a claimant's obesity may be due to the effects of medication or inability to exercise due to pain.



# INDIVIDUAL CHARACTER LETTERS

October 10, 2006

To Whom It May Concern,

I am writing this letter on behalf of Jennifer Chao. Jennifer has been a close friend since 1984. We met in college while in the nursing program at University of Delaware. We were college roommates and then shared an apartment after graduating and working as nurses. During those years Jennifer was a young, vibrant and ambitious person.

It was her dream to become a nurse anesthetist, and she accomplished that dream and loved her job. Sometime during her pregnancy with her son, her health changed. She began experiencing severe pains in her legs and back, but continued to work in the OR as a nurse anesthetist. After the birth of her son, she felt better and we thought the pain was behind her. Unfortunately, we were wrong. Jennifer began to suffer flare ups of muscle weakness and pain in her lower limbs. These flare ups occurred every few months causing her to be in bed for several days or weeks, followed by periods of remissions. It was difficult to see her in debilitating pain and I know deciding to discontinue work was one of the hardest decisions she had to make. She loved her job.

Her condition is such that it affects her relationship with her husband and son. She loves them very much and would like nothing more than to have a normal, active life with them. She misses out on many things that most of us take for granted, and it is only through the support of her family and friends that she is able to got on an occasional ski or beach vacation. Her health has affected our friendship because she simply can't fly out alone to visit me. She can never plan to meet friends out for lunch or shopping. Whenever I am in town, I go to her house to visit her as she is not well enough to go out.

As a nurse practitioner, I am well aware of the diagnosis of fibromyalgia and chronic fatigue, and the stigma they carry. Due to the unpredictability of her illness, I find it unfathomable that anyone would expect Jennifer to work full-time even at a light or sedentary job. To properly work any job, you first must be able to show-up. The unpredictability of her condition, would mean that Jennifer would call off sick most days of the week. I don't know of any employer who finds that acceptable or cost effective. I do not see Jennifer as a reliable employee due to her condition. On her good days, Jennifer is still on pain medications to function. She is forgetful and has trouble making decisions. She is dependent on others most of the time. Just because she has the ability at times to run an errand, or walk the dog, or spend time with her child, does not mean she is not suffering. Jennifer's life is nothing like she planned and nothing her family and friends ever dreamed it would be. Jennifer was destined for the fairy tale life, and unfortunately is living a nightmare. I would not wish her condition on anyone. She is not lazy, or money hungry. There isn't a day that goes by that she doesn't wish her life was different. In my experience, anyone living with a chronic illness usually suffers depression and the feeling of hopelessness. Jennifer is no exception. She is still young, but is trapped in a body that has failed her. Last week I was diagnosed with cancer. I know if I survive, I will be able to function and participate in my life. With Jennifer's

condition, there is no known cure, no answers, only hope that someday her pain will dissipate. I can predict my treatment and outcome based on my illness, but Jennifer cannot.

Jennifer is a wonderful and giving person, and I know she would rather be the one lending a hand to another instead of being on the receiving end. As nurses, Jennifer and I spent our time and energy helping others and we loved every minute of it. Now it is time to help Jennifer as she is a deserving person.

Yours truly,

Lori O'Toole

October 11, 2006

OJR

'OCT 1 3 2006'

Mr. William J. Rhodunda
P.O. Box 2054
Wilmington, DE 19899

Dear Mr. Rhodunda,

I wanted to take a moment and send you this letter about Jennifer Chao. I understand you are representing her on a legal basis for a hearing about her physical condition.

I live next door to Jennifer and Min. It is such a shame that she is unable to enjoy her life and must remain in bed most days. I see her occasionally in her back yard and we have a chance to catch up. Some days I don't even know if I should call her on the phone because I may be waking her up after she has finally gotten to sleep. I know it has been difficult for her to go to the grocery store and I see Min doing some of the household errands.

I really don't think people understand her condition. I have read some information on the internet about fibromyalgia, but it is something that is hard to comprehend unless you have seen someone go through the daily "ups and downs" as I have seen with Jen. I couldn't imagine how difficult it would be to not know if you are going to feel good one day or end up in bed all day. Believe me this is how Jen has to live.

As far as Jennifer being able to work....are you kidding me? I would say not. Don't think that she wouldn't like to go to work. She would like to do a lot of things that you and I take for granted everyday. What is so hard to comprehend is that this is not going to change. It has been several years now that Jen has not been able to function normally. And from what I understand it's not going to get any better. Sometimes I am amazed she can do anything at all. What ever can be done to make it a little easier for her would be appreciated.

Sincerely,

Kathy Moon
Kathy Moon

FROM:  David C Rising MD                    10 Oct 2006

RE:  Jennifer Chao

I am Jennifer Chao's father and an Orthopedic Surgeon ( recently retired) and as such I have been involved in Jennifer's problems with Fibromyalgia/ Chronic Fatigue in both capacities over the past 13 years.  For me there has been no worse feeling than having my daughter with a disease such as this look to her physician father for help when I know that neither I nor the medical profession in general  have any good answers or certainly no cures.  The up and down nature of the severity  and frequency is difficult for many including those in the medical insurance industry to understand.  I have seen her symptoms worsen over the past decade despite the best efforts of specialists, physical therapists, chiropractors and alternative medicine practitioners with the only result being that of helping her cope with her condition and at times giving her temporary relief of her pain.  I am just glad that she has found doctors who at least have some knowledge and understanding of this disease and are willing to treat her.  I am also thankful for her husband Min's willingness to " hang in there" with support in a situation that would test the strongest of marriages.

For my part, I have played a very small role in her medical care but have tried to give her love and support.  We have been frustrated in our many attempts to include Jennifer in family vacations and  get-togethers as she never knows when she will be able to tolerate even minor activities requiring minimal energy. Prior to the onset of her disease, Jennifer was extremely active in sports including tennis , horseback riding and skiing among other things.  Now just walking and doing minor chores are difficult most of the times.  During her bad times when she is bedridden and crying in pain,  she is certainly incapacitated. Much seems to have been made of her going on ski trips but I assure you that on the few trips she has been on, the travel through airports requiring handicapped motorized carts and walking with a  cane to get to ski resorts have made her so tired that she spends the next few days in bed.  She has never been able to ski more than once a week and then only for1-2 hrs before needing help to get back to bed.  We are now at the point of not planning any future ski trips because they are so hard on her.

Concerning her work status, I can assure you that her dream would be to return to work as a nurse anesthestist an occupation that requires mental and physical energy at a 100% level as well as reliability of being able to work on a schedule. These requirements can not even be met on her "good" days.  She also would not be able to work in any form of patient care taking the medications she needs for pain relief.  To say she could work at a menial job part time doesn't take into account the unpredictability of the disease as well as the above factors although it does solve the insurance company's problem.

Jennifer is working hard to cope with a life changing disease and we are very proud of her.

October 9, 2006

TO WHOM IT MAY CONCERN:

I have known Jennifer Chao for approximately four years. In that time, Jennifer has missed more social outings than she has attended due to pain. My husband has helped Jennifer by taking her son Zack to sporting events and practices when she has been unable to drive or run errands on bad days when Min is away on business.

Jennifer has a great outlook and wonderful personality, and I do not think she would want to be excluded from her child's life or socializing with friends and family if she had a choice. From what I understand, most days are very difficult for Jennifer. She wants to be healthy and exercise to help the pain, but is unable most of the time. Jennifer can, at times, pull it together and go out with her family, but inevitably ends up sitting and resting or in the bathtub trying to manage her pain. It is very sad for everyone around her.

Based on these facts, I think it would be extremely difficult for Jennifer to return to work. Driving a vehicle and doing the day-to-day activities that we all take for granted are sometimes impossible for Jennifer. Please fee free to contact me if you have any further questions.

Thank you.

Christina Atkins

**DOUGLAS G. TJADEN**
5951 CARVERSVILLE ROAD
DOYLESTOWN, PENNSYLVANIA 18901

OCT 18 2006

To Whom It May Concern,                    10/6/06

I have known Jennifer since her birth and have witnessed a tragic decline in her physical and emotional being. Due to her illness she is unable to engage in physical exercise and because of this, she has gained weight. This in turn, effects her self-esteem.

Medication has reduced her to someone family and friends have difficulty relating to. Jen has trouble concentrating and rarely can engage in coherent conversations.

The thought of Jennifer being able to return to work is beyond comprehension. Her condition has slowly and steadily deteriorated. Although we all pray and hope for improvement, the reality is that she probably will not.

Sincerely,
Douglas Tjaden

Jennifer Chao

**Statement of Wendy Danner (sister):** I am Jennifer Chao's sister. We are eighteen months apart and have always been close. Throughout our lives, I watched in envy as Jennifer excelled both academically and athletically. We shared many of the same interests and hobbies. Being that she preceded me in so many life's experiences, I frequently used to turn to her for advice.

Unfortunately, since she was inflicted with this God-awful disease over a decade ago, I have been a helpless bystander watching her quality of life slowly deteriorate. Her disease has been, and continues to be, the most painful thing in my life, the bane of my existence. My sister, once the most vibrant, jovial person I knew, has become a shell of what she once was. Words cannot describe the helplessness I feel when I pick up the phone and can hear only sobbing on the end, the frustration I feel when she is unable to recall recent conversations that we had, or the sadness I feel that she can never commit to anything because of the unpredictability of this wicked disease. Because this disease has robbed her of any ability to handle even the most minimal conflict, I 'walk on eggshells' so as not to upset her and exacerbate her fragile condition. Her life revolves around this disease which sadly dominates every conversation. Overlay those emotions with a tremendous feeling of guilt in not being the person Jennifer needs – one who is emotional and impassioned and willing to sit by her bedside for hours, rather than one who is realistic and pragmatic in a constant search for answers.

When Jennifer first told me her long term disability benefits had been terminated based on an opinion that she was capable of full-time work, I would have laughed had her situation not been so sad. Work a 40 hour work week? Don't get me wrong, I know she would love to. Regrettably since the inception of this disease, Jennifer lacks the concentration and stamina to even read the newspaper, let alone a book (a passion we both once shared). Her severe fatigue leaves her unable to plan her son's birthday, or even know whether she will be able to attend the party that I plan for him. The pain is so persistent it robs her of the ability to think clearly to help her son do his homework or even balance a checkbook. Yes, it is true that on a 'good' day, if heavily medicated (as she is every day), she may be able to tolerate the pain enough to drive her son to school, attend to an errand or two or a medical appointment, and, after resting all afternoon, even pick her son up.

Unfortunately, her 'good' days are far out numbered by the unpredictable 'bad' days where she is incapable of doing anything more than going to the bathroom. And the 'bad' days don't even include the 'really bad' days when she is in the throes of a flare-up writhing in pain for sometimes weeks at a time. These are the days that I, among other family members and friends, have to step in and attend to her basic necessities of life (i.e. get her son to and from school, prepare meals, and/or pick up her medications). Those are also the days when the survivor's guilt and feelings of helplessness in not being able to help her relieve her pain are overwhelmingly painful for those that love her.

Holidays, the very infrequent family vacation, and the rare wedding or funeral where Jennifer feels she has to be present, are by far the most difficult. She is wracked with anxiety and depression (as she is on every day at some level) for the weeks and days leading up to the event not knowing how she is going to feel. If she attends the event, she is usually heavily medicated, emotionally raw, and usually suffering from one side effect or another ranging from dry mouth and slurred words to loud and perhaps animated behavior. Where we once ran miles together and skied from dawn to dusk on family vacations, she now can only get through the airport in a wheelchair, and once at our destination, spends the majority of time in bed in a darkened room in pain.

In summary, the minimal activity she can do on a 'good' day, is probably is done within a few hours – a few very spread out hours - in a twenty-four hour period. But keep in mind, all during such time Jennifer is never without some level of pain even while on medication (which would preclude any job that drug level for narcotics). Moreover, the unpredictability of her 'bad' and 'really bad' days that keep her bedridden from days to weeks would preclude any type of job that required regular attendance or consistent performance. Finally, Jennifer frequently lacks an ability to concentrate or to retain any information for any length of time, two very important attributes of gainful employment.

FROM; Judith T. Rising                                October 10,2006

RE: Jennifer Chao

I am Jennifer's mother and for the past 13 years have watched Fibromyalgia and Chronic Fatigue take over her life, never losing hope for a cure. As a young woman Jennifer was always good natured, enthusiastic and energetic---spirited and willful [and as a mother, I'll add-- beautiful and smart]. I can't begin to tell you how hard it is for parents to watch what happens to a child with a chronic disease. We have watched Jennifer go from happy to depressed to suicidal at times--it breaks our hearts.

Our daughter's illness has affected every facet of her life. She worked so hard to become a Nurse Anesthetist and loved her job. She was devastated when she was in so much pain that she could no longer work. She missed her job, her colleagues, the responsibility, the respect-- everything! Her life has changed dramatically, as has ours. She tries to make plans with us but it is always understood that it may be a bad day and she may not be able to make it. We plan many family gatherings at home and at the shore. Our "at home" gatherings almost always have to be held at her home and are usually limited to an hour or so. Christmas, which was always a huge family event, is now celebrated with our family at her sister's, who lives close by, on Christmas Eve for dinner. She rests on Christmas Day and has dinner [which she does not prepare] at home or at her in-laws. She and her family used to come to the shore often-- this past summer they came for only one night over the 4th of July when it seemed too stressful for her. She rarely has the stamina to get to the beach, but did get there for an hour or so.

Every so often there will be a family trip that involves air travel. She has to arrange for a wheel chair in the terminal at both ends and is completely exhausted by the end of the trip. What we do on the trip is obviously compromised.

Even with the depression, the pain and the fatigue, she tries to do what she can. She tries to get Zach to school [but Min usually takes him]. She tries to see Zach's football games --She tries to be there for her family, but it has clearly taken it's toll. She is fortunate to have such a wonderful husband and an amazing son, who have done more than their share.

As for Jennifer's return to work — there is nothing she'd rather do — except maybe have more children and lead a "normal life." It is our dream, and certainly her's that this will happen but it does not seem possible at this time.

Judith T. Rising

October 18, 2006

TO WHOM IT MAY CONCERN:

I have known my wife, Jennifer Chao, for over 15 years. We first met in college during our junior year (1987), when I volunteered to have a nursing student do a health assessment report. We became instant friends. We started to date in our senior year of college, through her nurse anesthesia school and eventually married in 1991.

Jen, prior to her disability, was smart, witty, outgoing, energetic and full of life. She was an avid runners, skier and enjoyed many outdoor activities. During her pregnancy, in the last few months before she gave birth to our son, she started to develop bilateral pain down both of her legs. She took leave from work and was on bed rest for the remainder of her pregnancy. The doctor hypothesized that the baby was lying on her sciatica nerve, causing the pain. Immediately after the delivery, the pain faded.

After a couple of months going through the normal new mother's initiation of having a baby, she started to run to get back in shape. In July of 1994, while running down the shore, she felt some pain to her lower extremities. This was the start of many months and years of going to many doctors to diagnose her pain and fatigue.

Jen has changed in many ways from the disability, but she is still the same loving, sweet and beautiful person that I fell in love with. The only difference is that she has many more limitations caused by her disability that hinder her from functioning normally every day. Her disability (fibromyalgia) is unpredictable, which is very frustrating to her and the whole family. She never knows how she is going to feel until she wakes each morning and after taking her medication. Every day is different with some degree of pain and fatigue and emotional stress. On her better days, she is able to do more than the days that she is not as good. She gets by each day with the help from me, our son, our house keeper, family and many great friends.

On a typical day, when I am not traveling for work nor have early meetings for work, I will get our son ready for school and take him. Jen will usually do some light house work and run a couple of errands, which includes going to the store, doctors appoints, etc. Her fatigue and pain will dictate how much she can do. I typically will call in the mid afternoon to see how she is doing and if she needs me to run a couple of errands and pick up our son from school. After getting home and situated, I will get dinner ready. However, on the days that her pain and fatigue are not too bad in the evening, she will help with dinner. To put this in perspective, she can be in bed all day with extreme pain, fatigue and emotional stress, needing help with everything. On other days, she has moderate degree of pain and fatigue that allows her to perform a few hours of tasks before needing to rest. All of this is with her prescribed medications from her doctor.

Jen's disability has limited her to live a normal life. She has been forced to give up so many things she used to love and enjoy. She loved her work, social life, freedom to do



outdoor activities and so on. Her disability now is controlling her life, dictating her limitations as to what she can or cannot do each day.

Fibromyalgia is a cruel disease that is unlike any other disease. There are no medical tests that can quantify the diagnosis. The medical society does not understand the mechanism or know what causes this condition. There are only hypothesis. The treatment is different for every patient. Most of all, the disease is not terminal, but puts the person through agonizing pain and suffering throughout their life.

I know my wife better than anyone. I have seen her on a daily basis for the past 11+ years, go through the emotional ups and downs, pain and suffering. She has suffered through so much with this disability. She does not want to be disabled and have to live the rest of her life in pain and suffering and the emotional roller coast. She wants to be a normal person that is able to live life, enjoy a career and a normal healthy mom to a great son. I know that it hurts her greatly to not be able to do more things with our son, Zach and have him see the difficult hardships of her disability. Jen has the disability, but it is really a disability that impacts the entire family. In a strange way, Jen's disability has made Zach a more independent, very kind, more mature and very special boy.

Sincerely,


Min Chao

**From:** chad danner [mailto:dannerhome@comcast.net]
**Sent:** Friday, October 20, 2006 10:15 AM
**To:** William Rhodunda
**Subject:** Jennifer Chao Letter

I've known Jennifer for 10 years. Unfortunately, I've only known the person who is sick and limited. I'm told of the times when Jen was active and vibrant....running, skiing and playing tennis. But the Jen I know is much different. The person I know can barely get her son to school on a good day and barely get out of bed on a bad day. She is someone whose high's and low's depend on whether she's had enough medication to mask the pain of her illness. Like many people, when medicated, Jen is in no shape to drive or even care for her family. Yet without the medication, she is in excruciating pain. This is quite the "catch 22". These flare ups are unpredictable and prevent Jen from normal planning of day to day activities. On any given day or even time of day, she could be confined to her bed, without warning. The medication she takes leaves her senses dulled and motor skills limited. It is hard to depend on Jen for even the smallest of responsibilities within her own family structure, let alone a business or employer. It saddens me to see how this affects the entire family. This has been an on-going and deteriorating issue for the duration I've known this family. To suggest that she is "faking it" or exaggerating this illness is preposterous. To know how everyone involved is hurting from this situation is to know the grief and despair of watching a loved one suffer.

# EXECUTIVE SUMMARY

Jennifer Chao (d.o.b. October 21, 1965) ("Claimant") attended the University of Delaware from 1984 to 1988 and graduated with a Bachelor's of Nursing Degree. She worked as an Intensive Care Unit (ICU) Nurse from 1988 to 1989 at St. Francis Hospital in Wilmington, Delaware. Claimant then attended the Medical College of Pennsylvania and graduated with a Masters of Anesthesia in 1990. She then worked as a Certified Registered Nurse Anesthetist (CRNA) from 1990-1995 at Christiana Hospital. (Exhibit 1)  During such time she was covered by a long term disability (LTD) benefit through ITT Hartford ("Hartford") (Policy No. GLT 33229) (Exhibit 2)

Claimant married in August of 1991 and became pregnant in May of 1993 with her first child. She began experiencing pain in her lower back area when she was approximately five months pregnant. (Exhibit 3)  Diagnosed with sciatica, she was placed on bed rest for the remainder of her pregnancy (approximately four months) and was prescribed Codeine for the pain. (Exhibit 3) She gave birth to a healthy baby boy on March 2, 1994 fracturing her coccyx at the time of delivery. (Exhibit 3)

Claimant thereafter resumed normal activities and returned to work part-time (24 hrs./wk.) after eight weeks. (Exhibit 1)  On September 2, 1994 she returned to work on a full-time basis (40 hrs./wk.). (Exhibit 1)  However, after several weeks, Claimant again began experiencing pain in her lower back.  In an effort to mitigate her pain, she reverted back to part-time (32 hrs./wk.) on October 1, 1994 and sought accommodation from her employer, namely, assistance with the most physically strenuous activities required in her job as a nurse anesthetist.

Eight months later, in early June, Claimant's pain worsened while exercising at the beach. (Exhibit 4)  Two weeks later she experienced a severe exacerbation of the pain while lifting her then-fifteen (15) month old son.  (Exhibit 4)  On or about June 20, 1995, Dr. Estock (Family Physician) diagnosed her with lumbosacral strain with sciatica and prescribed a non-steroid anti-inflammatory and physical therapy. (Exhibit 5)  Approximately a week later, the pain moved to her upper back and she was prescribed a muscle relaxant as well as a narcotic pain reliever for the most severe pain. (Exhibit 6)  A lumbosacral spine MRI was normal (Exhibit 7) as was an x-ray with a "slight scoliosis convex to the left." (Exhibit 8)

After her symptoms persisted, she was placed on a two week medical leave on July 13, 1995. (Exhibit 5) On July 17, 1995, she again saw Dr. Estock and was prescribed an anti-depressant to address the depression she was experiencing from the debilitating pain. (Exhibit 5)  The blood tests to evaluate her thyroid function were within normal ranges. (Exhibit 9)  On July 19, 1995 she underwent an epidural steroid block at the Surgery Center at Christiana Hospital which alleviated her pain for several days. (Exhibit 10)  Unfortunately, the second block she received did not improve her condition as successfully as the first one. (Exhibit 11)

Although the Claimant has had a history of sporadic migraines, she experienced a severe migraine on August 30, 1995 that was unresponsive to medication leaving her weak, shaky, blurred vision and nausea.  (Exhibit 12)  She was transported from Dr. Estock's office by ambulance to the emergency room at Christiana Hospital. (Exhibit 12)

On September 1, 1995, her symptoms were progressively getting worse making prolonged sitting or lifting her child increasingly difficult. (Exhibit 11) Dr. Koyfman (Neurological surgery) concluded there was no clear evidence of lumbar radiculopathy (i.e. nerve irritation caused by damage to the discs between the vertebrae) and recommended that a head MRI be performed to rule out midline process and demyelinating diseases (i.e. MS). Such head MRI was negative. (Exhibit 13) Subsequent blood work, including a chemistry profile, CBC with differential, thyroid studies, and a Lyme titre, were "unremarkable." (Exhibit 13 & 14)

After a series of extensions of her medical leave (Exhibit 15), Claimant's last day of work was September 6, 1995 and she filed for LTD benefits through Hartford the next day. (Exhibit 16)

On September 22, 1995 Dr. Cucuzzella (Physical Medicine and Rehabilitation (P. M. & R.) performed an electrodiagnostic evaluation (EMG) of both lower extremities which revealed "decreased recruitment consistent with a mild right S1 radiculopathy." (Exhibit 13) Dr. Rudin (Orthopedic Spine Surgeon) ruled out a surgical problem regarding her spine. (Exhibit 13) Suspecting a right S1 joint dysfunction, she was referred to Dr. Falco (Physiatrist). Dr. Falco reported her pain as follows:

> [B]ilateral leg pain, right slightly greater than the left. The pain starts in the central low back area and is described as sharp. The pain radiates into both posterior thighs and buttocks, right grater than the left. Again, it is described as a sharp quality. She has dull, aching quality pain which radiates distally into the thighs and calves as well to the outside of the ankle. She describes her burning discomfort, again right greater than left, as a burning, tingling sensation with electrical quality. The symptoms in the feet seem to be coming from within as opposed to the outside. She feels that her feet are somewhat swollen. She also has pain that radiates into both groins, right greater than left, which is described as sharp. She states that her symptoms have been of this nature for the last four months.

> Her pain level complaints are a 5 to 7 on a Visual Analog Scale of 10. Walking or being upright as well as lying on either side seems to increase her symptoms. (Exhibit 13)

On October 23, 1995, Dr. Falco injected Claimant's bilateral sacroiliac joints, or S1 joints, with steroids and Marcaine (local anesthetic). (Exhibit 17 & 15) Unfortunately, she obtained no relief from the procedure. (Exhibit 18) Claimant had a repeat of the MRI of the lumbosacral spine with images through the S1 formen bilaterally, which again were unremarkable. (Exhibit 19) Her sedimentation rates were also within the normal reference range. (Exhibit 20) On November 29, 1995, Dr. Falco performed a single shot lumbar epidural steroid injection as well as a right S1 selective nerve root block. (Exhibit 21) For approximately a month, Claimant had a fifty percent (50%) improvement in the pain in her legs, but noted that during such time her back pain had become more noticeable. (Exhibit 22) Dr. Falco concluded there was some inflammatory component within her spinal canal and that she was unable to perform any Nurse Anesthetist activities. (Exhibit 22)

Claimant experienced a flare-up before Christmas that year and took a Medrol-Dosepak (Steroid) which provided temporary relief. (Exhibit 22) At such time, she was also experiencing chronic

yeast infections and was taking a twenty-six (26) week course of Diflucan (antifungal medication). (Exhibit 23)

On January 22, 1996, Dr. Falco opined that Claimant had a moderate limitation of functional capacity (i.e. restricted 60% - 70%), that she was totally disabled from her job and would never be able to return, but could in the future perhaps work part-time in "any other job" that involved sedentary[1] activity. (Exhibit 24) He felt she was not a candidate for further rehabilitation services as she had reached maximum medical improvement. (Exhibit 24) Dr. Falco felt he could do nothing more for her and recommended she see a Neurologist that specializes in myofascial pain and obtain a second opinion from a Rheumatologist. (Exhibit 25)

In mid-February, Claimant described her pain:

"I experience almost continuous pain and fatigue in almost every muscle in my body. I experience twitching and painful knots frequently. At different times I may have difficulty breathing from pain in my intercostals muscles. I almost always have pain and burning in both feet. I rarely can walk more than 2 blocks without rest from muscle fatigue. I am exhausted from the pain I have and even on a 'good day' I need to lie down 2-3 hours. Many days I have such spasm and pain I need to be in bed." (Exhibit 26)

And described what activities she was capable of on a "typical day":

I have a 2 year old son, so I get up with him. I mostly stay in and around the house. On a 'good day' we make short trips to the grocery store, pharmacy, etc. On a 'bad day' I either get through on the couch or my mom comes to help me... on 'good days' I still rest 2-3 hours after lunch... I obtain my groceries – usually in the morning when I'm stronger and can stand the pain better. My husband goes if I'm in bed on a 'bad day.' (Exhibit 26)

On February 19, 1996, Claimant sought a second opinion from Dr. Skubick (Neurologist), a specialist in myofascial syndrome and fibromyalgia. (Exhibit 27) He noted that her "...pain seems quite variable in that, at times, she is disabled by such, that is, unable to walk for any length of time without severe pain. At other times, the discomfort is much less impressive allowing her to be ambulatory." (Exhibit 27) After the examination, Dr. Skubick diagnosed her as having "definite fibromyalgia" and superimposed thereon he found "evidence of a focal and somewhat asymmetric myofascial syndrome" (i.e. refers to pain originating from muscles that are in spasm) "involving the peroneus longus, vastus medialis, and the gluteal complex, greater on the right than on the left." (Exhibit 27) Dr. Skubick recommended a different anti-depressant (i.e. Elavil), muscle relaxant (i.e. Flexiril), non-steroidal anti-inflammatory (i.e. Daypro), and narcotic (i.e. Utram) medications, in-shoe orthodics, and trigger point injections. (Exhibit 27)

---

[1] Definition "Sedentary Work": The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally'" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. Unskilled sedentary work also involves other activities, classified as "non-exertional" such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions. *Social Security Ruling* SSR 96- 9p.

He concluded that "she is disabled from her job as a nurse anesthetist as [P]rolonged standing would really be impossible given her present symptom complex." (Exhibit 27)

In March 1996, Claimant reported that her most significant physical limitations were her inability to walk any distance of more than a block or two, sustain muscle contractions for more than twenty (20) seconds, or sleep, which in turn aggravated her fatigue even more. (Exhibit 28) On May 16, 1996, Claimant's request for LTD benefits was approved retroactive to March 7, 1996. (Exhibit 16)

In June 1996, she changed back to Prozac (anti-depressant), as she felt Elavil was making her lethargic and causing her to gain weight (Exhibit 29), and started taking Synthroid (thyroid hormone). (Exhibit 29) Three weeks later, she reported feeling stable, but still was experiencing bad days with a great deal of muscle pain and weakness forcing her to rest all day. (Exhibit 30)

In a letter to Hartford dated August 5, 1996, Dr. Falco (Physiatrist) opined:

> "She is never without pain. The pain is sometimes worse than other times. There are times when she can only ambulate with crutches or a cane. This makes it difficult for her to sustain any job or occupation since her symptoms wax and wane so much she is not able to predict she is able to do any kind of constructive activity and days when she is bedridden.
>
> Based upon this fluctuating symptom complex... it is my opinion that she is not capable of working at this time... I will defer any further details regarding Ms. Chao's condition to Dr. Estock. (Exhibit 31)

On August 20, 1996, Claimant filed for Social Security Disability benefits. (Exhibit 32) She explained the symptoms of her fibrolmyalgia:

> I continue to have episodes of muscular pain, primarily below my waist but more and more in my upper body at unpredictable times. These "episodes" have increased in duration lasting from 2-5 days, and occurring at least twice a month. During the most intense periods I cannot ambulate at all by myself, and at the less intensive period of these episodes I need crutches or a cane to ambulate. I have so much spasm and pain that I cannot do anything. I cannot care for my 2 ½ year old son who I place in emergency daycare. During my muscle "flare-ups" I need help getting to the bathroom, with my meals and medications. I am unable to move without feeling like I will pass out from the pain or get sick. I just stay in bed until my condition subsides. These last anywhere from 2-5 days.

On September 12, 1996, Claimant reported that she had stopped both the Synthroid (thyroid hormone) and Prozac (anti-depressant) as she and her husband were trying to conceive. (Exhibit 33) A subsequent thyroid test was returned with normal results. (Exhibit 34) However, in less than a month after stopping the medication, Claimant experienced a severe flare-up leaving her bedridden with excruciating, debilitating pain. (Exhibit 35) She again confirmed she had been experiencing such episodes once or twice a month leaving her debilitated anywhere from four to

five days. (Exhibit 35) Claimant reported that this unpredictability of her pain had left her overwhelmingly anxious and depressed. (Exhibit 35) She and her husband abandoned their efforts to conceive another child. (Exhibit 35) Claimant again started taking Prozac (anti-depressant), was prescribed a Fentanyl Patch[2] (to be used in lieu of Tylenol #3), and Xanax (anti-anxiety), and it was agreed she would go back to the Pain Center for trigger point injections.[3] At this visit, it was noted by Dr. Estock (Family Physician) that she was currently on disability and would remain so because of her inability to work.[4]

Ironically, on that same day, Dr. Estock received a call from Hartford requesting that he fill out Claimant's Physical Capabilities Form. (Exhibit 36) The nurse practitioner explained to Hartford that Claimant was in the middle of a flare-up, having severe pain, and walking with a cane, so clearly "she did not feel today was a good day" to fill out the form. (Exhibit 36) The nurse practitioner confirmed that Claimant was not malingering, was "desperately looking for help with the pain," and would not be prepared to do a Functional Capacity Evaluation until at least a month of pain therapy. (Exhibit 36)

After an office visit in mid-November 1996, Dr. Murphy (Rheumatologist) noted that Claimant has had an increase in frequency and intensity of migraines since the inception of her chronic pain. (Exhibit 3) After an evaluation, based upon the number of the typical tender points, her history of sever fatigue, increased migraines, and non-restorative sleep, Dr. Murphy confirmed the diagnosis of fibromyalgia. (Exhibit 3) She recommended Paxil (anti-depressant) and Flexeril (muscle relaxant) before bedtime to improve her sleep cycle. (Exhibit 3) Based upon Claimant's inability to stand and function all day and the problems with her memory and concentration, Dr. Murphy concluded she would probably not be able to return as a nurse anesthetist, but may be able to perform a part-time sedentary job that did not require a high level of functioning deferring such decision to Dr. Estock (Family Physician).

On November 25, 1996, Claimant reported that she had used the Fentanyl Patch twice in the past two months in response to severe flare-ups which helped "tremendously" with the pain, but was cautioned not to use the patch more than once every two to three months. (Exhibit 37) On December 8, 1996, Claimant and her son were awarded full Social Security Disability benefits. (Exhibit 38)

For a continuation of her LTD benefits, Claimant was informed by Hartford that she would be required to submit to an Independent Medical Exam (IME). (Exhibit 39) Despite knowing the extent of her disability and her inability to travel far distances, Hartford felt that it "may be a good idea to go as far as Baltimore to do [the IME]" fearing that any local exam "may be less than objective" given "Claimant's family connections with the medical field."[5] (Exhibit 40)

In the letter requesting that the Dr. Rosen, a Physiatrist, perform an "objective exam evaluation," Hartford's assessment of the situation was far from objective. Hartford emphasized Claimant's

---

[2] A fentanyl patch is an opioid pain medication, administered into the body slowly through the skin, where it works to relieve pain for up to three days. http://www.duragesic.com.
[3] Id.
[4] Id.
[5] Claimant's father was an Orthopedic Surgeon in Sellersville (Bucks County), Pennsylvania, who retired in the early nineties; claimant's sister-in-law is an orthopedist in Philadelphia, Pennsylvania; neither have medical ties to Delaware.

"family connections within the medical field," that Claimant had "no intentions of a return to work," and that "her energy is focused on caring for her son." (Exhibit 41)

During the Functional Capacity Evaluation performed on January 6, 1997, the physical therapist noted that "despite valid efforts throughout the test," she quickly developed pain during lifting and concluded that she should not be climbing stairs, lifting patients or equipment or prolonged standing. (Exhibit 42) After his examination, Dr. Rosen concluded she was disabled from returning to work as a nurse anesthetist in light of the impact "that safety and poor performance may have on the lives of other individuals" in emergency situations. (Exhibit 43) For a treatment plan, Dr. Rosen recommended a comprehensive pain management approach, trigger point injections, and physical therapy, taking into account her complaints of "fatigue, poor sleep, and weakness." (Exhibit 43)

On February 6, 1997, Claimant requested and was issued, a referral to a psychologist to help her deal with the chronic pain. (Exhibit 44) At such time, Claimant reported she was unable to return to work as a nurse, or even return to physical therapy, in light of her chronic pain. (Exhibit 44) Claimant was prescribed Demerol (narcotic pain reliever) to address the pain. (Exhibit 44) Approximately a week later, Claimant called stating she had been in bed since her last visit suffering another flare-up that was unresponsive to medication. (Exhibit 44) At a follow-up visit, Estock (Family Physician) recommended a bone scan as it was "about the last test that hasn't been done," prescribed Dilaudid (narcotic pain reliever), and informed Claimant that in light of her chronic condition, he would have to refer her to a chronic pain specialist who would be responsible for administering her narcotics. (Exhibit 45) The subsequent bone scan was normal. (Exhibit 46)

For the next several months, Claimant attended the Wilmington Pain Clinic but stopped because they were just giving her pain medications that she did not feel were helping. (Exhibit 47) After being on the Fentanyl Patch for three weeks in May, she stopped without any withdrawal symptoms and was taking Flexeril (muscle relaxant), Ambien (sleep aid), Prozac (anti-depressant), and Advil. (Exhibit 47) Claimant engaged in bio-feedback and alpha-wave training with Dr. Nigro (Psychologist) but reports such treatments did nothing to help her chronic pain. (Exhibit 47)

After the flare-ups continued on a monthly basis, Claimant went to the Center for Pain Management at the Medical Center of Delaware to see Dr. Witherell (Anesthesiologist) in August of 1997. (Exhibit 48) He continued her current regime of Flexeril (muscle relaxant), Ambien (sleep aid), Prozac (anti-depressant), Ativan (anti-anxiety), Tylenol #3 and the Fentanyl Patch for flare-ups.. (Exhibit 48) He noted that although she was improving gradually with the medications, physical therapy, and whirlpool treatments, she suffered a flare-up for the first two weeks of November that was very disruptive. (Exhibit 48)

On November 24, 1997, Dr Estock filled out Claimant's Attending Physician's Statement of Disability for Hartford diagnosing her with Fibromyalgia and identifying her symptoms as stiffness, pain, fatigue, trouble concentrating, disturbed sleep. (Exhibit 49) In response to the extent she was able to engage in certain activities, Dr. Estock stated:

All of the activities listed would have different limitations depending on how [the patient] felt on a particular day. With fibromyalgia, all of the symptoms are subjective and limitations are determined by the patient. I believe that her Personal Profile Evaluation gave you a good description of her capabilities from her perspective. (Exhibit 49)

In her Personal Profile Evaluation, Claimant's description of her chronic pain and what activities she could perform on a typical day remained consistent with reports since the inception of her conditions (Exhibit 50):

My physical complaints from fibromyalgia and chronic fatigue are numerous ranging from severe muscle cramps in almost any muscle, to pain so severe that any movement or even awareness of it causes me to become dizzy and nauseous. I am often "blurry-eyed" with fatigue, unable to drive, read or focus. Even on "good" days, I have unpredictable periods of pain, sharp cramps, twitching muscles, numbness and/or tingling in muscle groups throughout my body.

[On a typical day], I rise feeling un-refreshed from a usually restless night of broken sleep... I am always very stiff and in pain getting up. Moving and stretching helps and I routinely do a lot to get going. I constantly evaluate the level of pain, stiffness and fatigue as I go. Before I commit to a day in bed, I always get on my stationary bike or stair stepper to work through the pain. Sometimes this helps, sometimes I get dizzy and nauseous but overall it has helped condition me aerobically and physically as well as mentally. If I cannot do a work out from too much pain, I take a muscle relaxant and try Advil before taking anything stronger. Then I get my son to daycare, sometimes my neighbor or my sister helps me.

On very bad days, I just do relaxation techniques, pray and meditate. My family and neighbors help when I have my flare-ups that last days or weeks (one was 3 ½ weeks). On a good day, I prepare for the bad ones. I do errands in the morning (light grocery shopping, pharmacy, post office, etc.). I try to just do one or two so as not to get fatigued. After lunch I rest every day from 12-2. Then I do light housekeeping, laundry, picking up. I have a cleaning lady for the heavy cleaning. I pick up my son around 5:00 and prepare dinner if I can. My husband is home to help me around 6-6:30. If I am too fatigued and uncomfortable, my husband picks up our son and prepares dinner. Even on the best days, I can count on a lot of pain in my feet along with increasing fatigue. I cannot get up from a chair past 6:00 and am usually in bed by 7:30-8:00. I use my hot tub every evening and sometimes after a workout.

I [used] enjoyed sailing, windsurfing, skiing, jogging, gardening, antiques and entertaining in our home. Now I am very limited in all of these hobbies. Pain dictates what I can do physically and mentally. I did ski for a couple hours during a family vacation, but could not move very well for several days after. (Exhibit 50)

On November 16, 1997, Claimant had a follow-up appointment with Dr. Estock. (Exhibit 51)

On February 2, 1998, Dr. Witherell (Anesthesiologist) filled out Claimant's Attending Physician's Statement of Disability for Hartford. (Exhibit 52) He concluded that Claimant

reached maximum improvement and would need to retrain for an alternative sedentary occupation that did not involve lifting greater than 10 lbs, climbing, stooping, kneeling, crouching, crawling, or sitting, standing, or walking for more than three hours, or driving more than one hour.  (Exhibit 52)  However, as a predicate to her ability to engage in the aforementioned activities, Dr. Witherell stated:

> [Claimant] suffers from severe intermittent exacerbations of lower back/buttock and lower extremities during which time her physical capacity is markedly decreased below [the] above assessment and should be taken into consideration when assessing disability and future employment. (Exhibit 52)

Office notes for follow-up appointment with Dr. Estock.  (Exhibit 53)

On March 11, 1998, Claimant was prescribed a Fentanyl Patch to address a flare-up she was experiencing. (Exhibit 54)  In a letter to Hartford dated April 14, 1997, Dr. Nigro (Psychologist) confirmed there was no need for any psychological work-restrictions to be placed upon Claimant (Exhibit 55) but "that physiologically when she would have flare-ups, her pain was so severe, it seemed she was definitely unable to work during those times... [and] she never knew when they would happen and that they were completely unpredictable." (Exhibit 55)

In mid-May, Claimant expressed frustration to Dr. Estock (Family Physician) that the disability forms Hartford required her to fill out did not take into account the unique debilitating aspects of her disease:  "I do not know how to answer these!  I have severe flare-ups that are unpredictable, these are what keep me unable to function mentally and physically." (Exhibit 56)  In her June 6, 1998 Personal Profile Evaluation, the description of her condition and activities remained unchanged from six months earlier. (Exhibit 57)

On August 21, 1998, Dr. Witherell (Anesthesiologist) noted that while her pain remained the same, she was experiencing an increase in fatigue. (Exhibit 58)  Approximately a week later, Claimant visited Dr. Estock (Family Physician) after her second migraine in ten days left her with blurred vision. (Exhibit 59)

Again, in her Social Security Report of Continuing Disability, Claimant's description of her chronic pain and what activities she could perform on a typical day remained consistent with all past reports (Exhibit 60):

> I have had [severe fibromyalgia and chronic fatigue syndrome] for 4 ½ years and during this time I have had "flare-ups" that come without warning and keep me bedridden, unable to move without any help, and in severe pain throughout all the muscles in my body.  Recovering from these attacks, which last days, weeks, even months, take just as long.  I feel there has been a worsening of my condition in that I feel I have more total body involvement now then when it first began.  I also have more muscle fatigue and weakness...  I do light housework, dust, dishes, laundry, etc on good days.  On bad days, I cannot do anything – not even prepare meals – my husband does everything in the morning and evening.

My chronic fatigue/fibromyalgia continues to limit every aspect of my life. Its unpredictability, its severity keeps me in a constant state of emotional and physical ups and downs. I continue, despite trying every medication, every alternative therapy, to have period of being bed-ridden with weakness and fatigue throughout my body. Each day is spent managing my pain level, adjusting my errands, if I can do any at all, finding help if I need it, and trying to come to grips mentally with the cruel disease. Even during good days, I still need narcotics to do the most simple things and even then I am still usually bedridden by 4:00-7:00 p.m. by either the fatigue, weakness, and[/or] pain. My entire body is involved from migraines, which I get several times a month, to muscle spasms, and numbness in my hands and feet. I have to reduce my exercise to gentle stretching in warm water several times a day. I meditate twice a day and do relaxation exercises.

On November 23, 1998, Claimant, accompanied by her concerned family, attended an office visit with Dr. Estock (Family Physician) where she reported a continuation of marked fatigue, fuzziness of thought, discomfort, and severe and disabling pain. (Exhibit 61) In response to her severe flare-ups, she continued to take Percocet every four hours and sometimes a Medrol dosepak (Steroid) (such medications then being handled by the Pain Center at Wilmington Hospital). (Exhibit 61) Dr. Estock ordered a repeat of the laboratory work, a repeat of the brain MRI, and a referral to Dr. Carrunchio (Neurologist/ Penn). (Exhibit 61)

Ten days later, Dr. Estock (Family Physician) evaluated Claimant in response to muscle aches, back pain, kidney pain, a severe migraine that left her nauseated, and a Morton's neuroma on her left foot. (Exhibit 62) Dr. Estock concluded that the symptoms are likely a result of coming off of the Medrol Dosepak (steroid) she had recently taken in response to a flare-up. (Exhibit 62) She was also prescribed Diamox for mountain sickness in preparation for an upcoming trip with her family. (Exhibit 62) The repeat of the laboratory work and the MRI of the brain showed no abnormalities. (Exhibit 63)

On February 5, 1999, Claimant was evaluated by Dr. Carrunchio (Neurologist) who noted that "her symptoms have been chronic with a waxing and waning course" and "for the most part her discomfort has been constant and significant impairing her ability to get about" to the point where "often she is bedridden." (Exhibit 64) He noted that "[f]or the last four or five years she has been on Percocet and for quite sometime she has been averaging two tablets [every] six hours. (Exhibit 64) Dr. Carrunchio recommended weaning off the Percocet, but noted that Claimant felt nothing else had been able to curtail her pain such that she could function. Additionally, Dr. Carrunchio recommended the addition of Neurontin (i.e. a medication that affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain), perhaps trying a different anti-depressant, a repeat MRI of the lumbrosacral spine with gadolinium (i.e. a dye that provides greater contrast between normal tissue and abnormal tissue), and a referral to a Rheumatologist at a major university hospital. (Exhibit 64)

On March 15, 1999, Claimant was evaluated by Dr. Kolasinski (Rheumatologist at the University of Pennsylvania) who noted that "[a]bout twice a week she gets to the point where she can't move due to fatigue," once every several months she has a "flare" that can last "from one to six weeks," and that she takes a steroid dose-pack to "break it." (Exhibit 65) Dr. Kolasinski

recommended that Claimant try to taper off the Percocet, avoid the steroid dose-packs, and follow-up with a psychiatrist or psychologist "to work on coping skills." (Exhibit 65) She too recommended Neurontin and noted that Claimant's current regime of Flexeril (muscle relaxant) and Ambien (sleep-aid) were good choices for chronic pain management.

In response to severe flare-ups, Claimant was prescribed a Medrol-Dosepak (steroid) on February 10, 2000 after being bedridden for six weeks (Exhibit 66) and on April 17, 2000 (at which time she also switched from Prozac to Celexa). (Exhibit 67) On June 20, 2000, Claimant reported the state of her fibromyalgia remained unchanged; the chronic pain still prevented her from doing exercises and most household activities and she was still experiencing flare-ups that caused her to be bedridden for days at a time. (Exhibit 68) Although the Celexa improved her mood, she still found herself often teary and depressed. (Exhibit 68) A Hepatic Functional Panel (7) was returned within normal limits. (Exhibit 69)

On September 28, 2000, Claimant reported that the Percocet (narcotic pain reliever) ceased being effective that summer leaving her in constant pain (seven on a Visual Analog Scale of ten). (Exhibit 70) Claimant reported that she was still battling depression, fatigue, anxiety, and sleep disturbances due to fibromyalgia, but was slowly progressing in physical therapy (Exhibit 71) and had started seeing a Psychologist (Exhibit 71). On October 24, 2000, Claimant reported during a visit with Dr. Estock (Family Physician) that she was continuing to have "severe and significant discomfort at times" and that "it fluctuates quite a bit though she says she has some good days and some very terrible days and never knows when she is going to have a severe exacerbation of her symptoms. (Exhibit 72)

On October, 24, 2000, Dr. Estock (Family Physician) filled out Claimant's Attending Physician's Statement of Continued Disability for Hartford. (Exhibit 73) He noted that her condition remained unchanged, she suffered major impairment in several areas (i.e. work, family relations), was "unable to work at this time indefinitely," and that her impairment for certain activities was a maximum of an hour on a 'good day' and "on a bad day not at all," and that such impairment would last "indefinitely." (Exhibit 73)

In accord, Dr. Witherell (Anesthesiologist) concurred on Claimant's Attending Physician's Statement of Continued Disability for Hartford (Exhibit 74) finding her condition was "unchanged" and that she had "variable ability" to stand, walk, sit, lift, carry, etc "relative to muscle pain and fatigue" when asked hoe many hours of the day Claimant was able to perform certain activities. (Exhibit 74) Again, on the Claimant Questionnaire, Claimant's description of her chronic pain and what activities she could perform on a typical day remained consistent with reports since the inception of her condition (Exhibit 75):

> My chronic fatigue/fibromyalgia continues to limit every area of my life. I believe I may have more weakness and muscle fatigue than before, but other than that, pain, flare-ups, spasms, etc. continue unrelenting and as unpredictable as before. I still have periods for up to 2 months where I cannot do more than go to the bathroom with help. I have trained my golden retriever to help me with going up and down stairs, getting up out of a chair, and retrieving things for me. I am managing my illness better now than several years ago, but it still occupies all my time.

On a good day when weakness and pain are manageable, I will drive my 6 year old son to school, then try to do an errand (grocery shop, get gas, etc.) to do even this requires that I have my medication on board. If it runs out, so do I. Many times I cannot move and need help from someone to get me to my car. If my day is a bad one, my husband takes care of everything and I stay in bed... I have not been able to attend any lectures or even support groups as bad as I am. I find it difficult to read or concentrate through my pain.

On April 9, 2001, Dr. Estock (Family Physician) noted that Claimant was continuing to have "immense problems in all areas of life from fibromyalgia and chronic fatigue." (Exhibit 76) On Claimant's Attending Physician's Statement of Continued Disability for Hartford, Dr. Estock (Family Physician) again noted that her condition remained unchanged, she suffered major impairment in several areas (i.e. work, family relations), she was unable to work, that her impairment for certain activities was a maximum of an hour, and that such impairment would last "indefinitely." (Exhibit 77)

On May, 11, 2001, Hartford informed Claimant that after an investigation, it was determined that Claimant met the new definition of total disability then in-effect[6] and would continue to receive LTD benefits. (Exhibit 78)

In early June, Claimant experienced another flare-up and was prescribed a Medrol-Dosepak (steroid). (Exhibit 76) Claimant continued to try to find ways to mitigate her chronic pain, including taking prescription Methadone, but was unable to find relief. (Exhibit 76) In mid-July, Dr. Golden (Anesthesiologist) took over the pain management aspect of Claimant's care from Dr. Witherell. (Exhibit 79) Dr. Golden noted that she had been on eight Percocets a day, but that such regime was discontinued for fear of Tylenol toxicity, and decided to have her try OxyContin (narcotic pain reliever) twenty (20) mg. every twelve (12) hours. (Exhibit 79)

On July 31, 2001, Claimant was contacted by Dr. Skubick (Neurologist) regarding an experimental procedure whereby Botox was injected into the muscle, an attempt to paralyze the same, to prevent spasms, which Claimant agreed to try. (Exhibit 80) Dr. Skubick (Neurologist) opined that based upon her distribution of pain, he did not believe there was any "primary psychiatric disturbance." (Exhibit 80) A subsequent CT Scan of her pelvis area was negative. (Exhibit 81)

After a severe flare-up in early September, Claimant returned to physical therapy, but explained that she would be unable to participate for several weeks after each Botox injection in order to recover. (Exhibit 82) On October 9, 2001, Claimant had a follow-up appointment with Dr. Estock for her depression, fibromyalgia and chronic fatigue. (Exhibit 83) Claimant commenced Botox injections on October 25, 2001. (Exhibit 84) She thereafter suffered a severe migraine on November 6, 2001. (Exhibit 85)

---

[6] Total Disability means that: "[for the first five years] you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full time basis. After that, and for as long as you remain Totally Disabled, **you are prevented by Disability from doing any occupation or work for which you are or could become qualified** by training, education, or experience." Medical Center of Delaware Group Benefits Plan October 1993, pg. 5 (emphasis supplied)

On December 29, 2001, Dr. Estock renewed Claimant prescriptions. (Exhibit 86)

On February 12, 2002, Dr. Estock (Family Physician) filled out Claimant's Attending Physician's Statement of Continued Disability for Hartford. (Exhibit 87) He noted that her condition remained unchanged, that her impairment for certain activities was a maximum of an hour, and that such impairment would last "indefinitely." (Exhibit 87) Dr. Estock office notes for 12/12/02 listed the Claimant's medications for the disability form. (Exhibit 89)

Again, on the Claimant Questionnaire, Claimant's description of her chronic pain, and what activities she could perform on a typical day remained consistent with her earlier reports (Exhibit 88):

> I have severe fibromyalgia, chronic pain syndrome, and fatigue for 8 years now, and these continue to limit everything I do. Every day is spent caring for myself and the unpredictable and unbearable pain that I have. Most days I am unable to walk, stand, even sit for more than a minute or so without unbearable pain or fatigue so severe that I pass-out (or get very close to doing so). Tasks, like grocery shopping are often impossible for me to do. My husband and close friends do much "running errands" for me and I have a helper who is close-by and weekly does the house cleaning, the laundry, and putting it all away. She helps me get up from a chair or up the stairs and to bed if I can't and is there whenever I need her help. On a good day, I can get dressed and drop my son off at his school and maybe do an errand before I "run out of fuel." I get stuck from misjudging how much I can do. Coping emotionally with this disease is a daily challenge.

> My husband helps me out of bed approximately 80% of the time. I lie unable to move from a laying position to sitting and walking. He assists me into the shower – after I am "warmed up" I can usually get my own meals and get my son to school. I have a helper who picks up my son in afternoons, picks up the house and cleans weekly. She also helps me with the groceries when I cannot. I require help getting up from a chair. Often I have too much pain after 4:00 to do anything for myself or family. My husband cooks and helps me to bed and my son.

Botox injections were done on October 25, 2001, February 7, 2002, and May 9, 2002. (Exhibit 90) Unfortunately, her progress was "slow," and even after waiting approximately six to eight weeks for the drug to take effect, she reported no objective improvement in her daily pain. (Exhibit 91 & 90) She continued making "moderate progress" in physical therapy (Exhibit 92) but had to stop when she suffered a severe sprained ankle after falling down the stairs in early June. (Exhibit 93) Her blood work continued to show everything was within normal limits. (Exhibit 94)

Claimant began physical therapy after her ankle had healed but reported growing increasingly depressed about her condition. (Exhibit 95) In an effort to overcome the fatigue she suffered during the day, Claimant was prescribed Provigil (wakefulness-promoting agent). (Exhibit 96 & 95)

On May 5, 2003, Dr. Estock (Family Physician) filled out Claimant's Attending Physician's Statement of Continued Disability. (Exhibit 97) He again noted that her condition remained unchanged, she suffered major impairment in several areas (i.e. work, family relations), she was unable to work, that her impairment for certain activities was a maximum of an hour, and that such impairment would last "indefinitely." (Exhibit 77) As Claimant was in too much pain to fill out her Claimant Questionnaire, Hartford allowed her to do so over the telephone. (Exhibit 98)

On May 8, 2003, on the renewal for Claimant's handicapped parking sticker, Dr. Estock (Family Physician) attested to the fact that Claimant "has physical disability... which is permanent... substantially impairs mobility... and [that she] would suffer hardship if application denied." (Exhibit 99)

When Wilmington's Pain Management Clinic closed, Dr. Skubick (Neurologist) took over the pain management aspect of Claimant's care from Dr. Golden (Anesthesiologist) on July 22, 2003. (Exhibit 100) He also discussed with Claimant a new experimental treatment whereby Novocaine followed by Botox is injected directly into nerve and recommended that Dr. Paulin (Physiatrist) at Bryn Mawr Rehabilitation perform the procedure. (Exhibit 100)

On August 28, 2003, Dr. Skubick (Neurologist) performed a lateral branch block (spine injections) with Novocaine which resulted in immediate temporary relief that lasted until the Novocaine wore off. (Exhibit 101) Unfortunately, when the procedure was repeated with Botox, Claimant did not experience any similar relief and was left incontinent for several weeks. (Exhibit 103) She was subsequently referred to Dr. Paulin for another round of Botox injections. (Exhibit 103)

On November 4, 2003, Claimant had a follow-up appointment with Dr. Estock to go over all of her medications and needed all of her prescriptions renewed. (Exhibit 102)

On November 6, 2003, Dr. Skubick (Neurologist) increased Claimant's Oxycontin (narcotic pain reliever) from 20 mg. in the morning and 20 mg. at night to 40 mg. in the morning, 40 mg. at night, and 20/40 mg. during the day depending on her pain. (Exhibit 103)

On January 5, 2004, Claimant had a follow-up appointment with Dr. Estock. (Exhibit 104)

Claimant's Attending Physician's Statement of Continued Disability was filled out by Dr. Estock (Family Physician) on April 4, 2004. (Exhibit 106) He noted that her condition had retrogressed, she suffered major impairment in several areas (i.e. work, family relations), she was unable to work, that her impairment for certain activities was a maximum of an hour, and that such impairment would last "indefinitely." (Exhibit 106)

Claimant had stopped seeing her Psychiatrist in February 2004 stating she was not comfortable with him, and obtained a referral to see Dr. Houser (Psychiatrist). Dr. Houser also agreed to administer all of Claimant's psychiatric medications (i.e. anti-depressants Prozac and Wellbutrin). (Exhibit 107)

On April 15, 2004, Claimant again described her chronic pain and how it affected the activities she could perform on a daily basis which continued to be consistent with all other reports. (Exhibit 108)

> I have severe fibromyalgia and chronic pain syndrome and fatigue and this severely limits everything I do, from being able to remember or recall the easiest of things to unpredictable levels of pain and weakness.
>
> Each day I wake up in some degree of pain and I usually need some help to get up because all my muscles feel stiff and gelled. So my husband helps get me moving and shower. Occasionally, my husband will need to take my son (10 years old) to school, there are times when I can drive, but not walk well or far. I try to do an errand each day, but if I sit or stop, I get "stuck" and need to ask strangers for a hand. I have a helper that comes at least once a week to do my laundry, clean, or whatever I need. On average 2X/wk. I will need to be in bed from being in too much pain (actually I'm in the tub) or weakness. I have help getting my son home, but I really make the effort to get him. Most of the time either my husband or my son make dinner because I'm usually at my worst after 5:00 or 6:00. Same for bed, my son is way beyond his years just from helping me.
>
> I used to run 3 mi/day, was an avid skier, played tennis, rode horses, gardened, windsurfed, and sailed. I cannot do these hobbies anymore. We still take ski trips to Colorado, but I stay in while my husband and son ski.

On April 22, 2004, Claimant was prescribed a Medrol-Dosepak (steroid) in response to another severe flare-up. (Exhibit 109) On May 5, 2004, a routine physical revealed all her systems were normal, with the obvious exception of her weakness and diffuse aches and pains, and that she had lost thirty (30) pounds on the South Beach diet. (Exhibit 109)

On June 30, 2004, Dr. Skubick (Neurologist) noted that the increased dosage of OxyContin (narcotic pain reliever) seemed to give Claimant "reasonably good control of her pain" although she was forced to cancel two appointments with Dr. Paulin (Physiatrist) for additional Botox injections because she was in too much pain to travel on such days. (Exhibit 110)

Claimant was able to travel to see Dr. Paulin on August 2, 2004. (Exhibit 111) During his evaluation of Claimant, he noted that there was "no particular pain pattern which is attributable to lifestyle or positioning." that she "can walk [but] sometimes needs assistance from a cane," that she "has been quite disabled as a result of this pain requiring numerous hours of sleeping and assistance with shopping." (Exhibit 111) He concurred with earlier diagnoses that her pain was myofascial and not neuropathic in origin. (Exhibit 111) Dr. Paulin concurred that a motor nerve block with Bupivacaine (local anaesthestic) to be followed with Botox injection should be tried again. (Exhibit 112)

In accord, Claimant's motor nerves in her buttocks region were injected with Bupivacaine (i.e. local anesthetic) on October 14, 2004 providing immediate relief until wearing off (prior to the

procedure her pain was eight on a Visual Analog Scale of ten; after it was reported as zero). (Exhibit 113) But unfortunately, as happened before, the subsequent Botox injections given by Dr. Paulin on October 22, 2004 offered no relief. (Exhibit 114)

Claimant's Attending Physician's Statement of Continued Disability was filled out by Dr. Estock (Family Physician) on February 25, 2005. (Exhibit 115) He noted that her condition was unchanged, she suffered major impairment in several areas (i.e. work, family relations), she was unable to work, that she had reached "maximum medical improvement," that her concentration was limited, that her impairment for certain activities was between forty (40) minutes to an hour, and that such impairment would last "indefinitely." (Exhibit 115)

On March 5, 2005 Dr. Skubick (Neurologist) referred Claimant to Dr. Gerwin (Neurologist) who similarly had experience in treating myofasical pain and recommended that she continue to take the 40 mg. OxyContin (narcotic pain reliever) three times a day. (Exhibit 114) Claimant was evaluated· by Dr. Gerwin on June 24, 2005. (Exhibit 116) He too confirmed the diagnosis of myalgia (primary), hypermobility syndrome, and chronic fatigue syndrome and recommended that a sleep study be conducted. (Exhibit 116) Claimant then underwent an overnight polysomnography (PSG), a test of sleep studies that monitors brain waves, breathing, stages of sleep and oxygen levels in the blood, among other variables. (Exhibit 117) The sleep study was returned "borderline abnormal" due to her having a borderline respiratory disturbance index (RDI, i.e. an index measuring respiratory events that disturb sleep). (Exhibit 117) It was recommended that she consider a CPAP (Continuous Positive Airway Pressure) contraption, lifestyle modifications, and the use of sedatives before bed. (Exhibit 117)

On August 17, 2005, Claimant informed Dr. Skubick (Neurologist) that the OxyContin (narcotic pain reliever) was not being as effective in controlling her pain. (Exhibit 118) He increased her dosage to forty (40) mg. four times a day and recommended that she consider a spinal segmental sensitization (Fischer Block) to be performed locally in Wilmington as the drive to Dr. Skubick's office was becoming increasingly difficult. (Exhibit 118) Claimant was referred locally to Dr. Friedman (Physiatrist). (Exhibit 119)

In mid-September 2005, Claimant began seeing Dr. Fiengold (Homoeopathist) who prescribed physical therapy three times a week. (Exhibit 120) However, after just three visits to physical therapy, Claimant was forced to cancel after she was involved in an automobile accident. (Exhibit 121)

On October 23, 2005, Claimant was evaluated by Dr. Friedman (Physiatrist) who noted that Claimant has suffered from fluctuating pain that would become so severe it used to leave her bedridden for weeks, but by using a Medrol Dosepak (steroid), she now is only bedridden for days at a time. (Exhibit 122) He concurred with the diagnosis of diffuse myofascial pain, centralized pain syndrome and fibromyalgia. (Exhibit 122) Dr. Friedman recommended she undergo trial injections for segmental desensitization, the first which she received on November 16, 2005. (Exhibit 123)

Claimant was under surveillance by Hartford on November 16, 2005 (Wednesday). (Exhibit 124) The investigator observed Claimant taking her son to school at 8:15 a.m., taking her dog to

the park for approximately thirty (30) minutes (8:36 a.m. – 9:06 a.m.), and then returning home. (Exhibit 124)  Claimant then departed her residence at 10:10 a.m., driving forty (40) minutes to Paoli for a medical appointment (11:11 a.m. – 12:15 p.m.), stopping at Wawa, and then returning home. (Exhibit 124)  Claimant departed once again at 3:10 p.m. to pick her son up from school. (Exhibit 124)  During the second full day surveillance on November 17, 2005 (Thursday), it was observed Claimant did not leave her residence. (Exhibit 124)

On December 15, 2005, Claimant reported to Dr. Fiengold (Homoeopathist) that she felt her condition had slightly improved in that she was using her cane less, was able to shop for food, and felt her energy level had somewhat increased. (Exhibit 125)  She stated she would like to start physical therapy again, but was recovering from a fall on the ice two days ago.  (Exhibit 125)  Dr. Fiengold prescribed a host of Homoeopathic herbal remedies. (Exhibit 125)

Claimant was seen by Dr. Friedman (Physiatrist) on December 22, 2005.  (Exhibit 126)  He noted that he would take over administration of her pain medicine as it was more convenient for her to travel to Bryn Mawr than North Wales to see Dr. Skubick (Neurologist).  (Exhibit 126)  Because the trial injections for segmental desensitization seemed to have caused irritation, Dr. Friedman recommended pursuing more of a dry needle/acupuncture approach. (Exhibit 126)

On January 5, 2006, Claimant was interviewed by Hartford's investigator. (Exhibit 127)  She reviewed the surveillance video, confirmed that it accurately captured what she was able to do on a typical day, but explained that it was the bouts of severe unpredictable pain that kept her bedridden for days that rendered her unable to work.  (Exhibit 127)  She confirmed that her family has taken ski trips approximately every other year, and that two years ago she was able to take two easy runs after being heavily medicated, rest for two days, and then take another two runs, again being heavily medicated. (Exhibit 127)  She admitted being able to drop-off and pick-up her son, walk short distances (sometimes with the help of a cane), run an errand or two, and attend medical appointments. (Exhibit 127)

On January 30, 2006, Claimant reported to Dr. Friedman (Physiatrist) that she had been feeling better until a flare-up that occurred around Christmas. (Exhibit 128)  In accord, Dr. Fiengold (Homoeopathist) noted that she had been doing better with the pain until this severe flare-up. (Exhibit 125)

On February 16, 2006, Hartford contacted Claimant's medical providers stating that what was observed on the surveillance tapes indicated that she could do more than her self-reported limitations and inquiring whether they felt she could do light or medium duty work for an eight hour day. (Exhibit 129)

Dr. Friedman (Physiatrist) informed Hartford that he was not involved with the job-disability assessment of Claimant's care.  (Exhibit 130)  Dr. Maas (Chiropractor) also deferred opinion as to her job-disability assessment to Dr. Estock (Family Physician). (Exhibit 131)  And rather than issuing an opinion, Dr. Estock (Family Physician) referred Claimant for a Functional Capacity Evaluation. (Exhibit 132)

Claimant was under surveillance by Hartford on February 26, 2006 (Sunday). (Exhibit 133) The investigator observed Claimant did not leave her residence. (Exhibit 133) During the second full-day surveillance on February 27, 2006 (Monday), she was observed taking her son to school at 8:17 a.m., attending a physical therapy appointment (9:15 a.m. - 12:39 p.m.), exiting with assistance of a cane and a noticeable difference in stride, and then returning to her residence. (Exhibit 133) Claimant departed once again at 3:19 p.m. to her son's school where she entered the school with her dog and a musical instrument at 3:31 p.m., came back out to drop something off in her car and again returned to the school accompanied by her dog at 3:35 p.m., came back out to walk her dog for approximately ten (10) minutes at 4:12 p.m., and again returned to the school at 4:24 p.m., finally leaving with her dog and son at 4:38 p.m. (Exhibit 133) Claimant then went to Wawa where she waited for her son in the car, then to Capriatti's take-out, then to the bank where she exited and returned to the vehicle, and then back to Capriatti's before returning home at 5:26 p.m. (Exhibit 133) During the third full-day surveillance on February 28, 2006 (Tuesday), after her husband took their son to school in the morning, no activity was observed until she left her house at 1:40 p.m. to go to her son's school, and then return to her residence at 2:03 p.m. (Exhibit 133)

Claimant's Functional Baseline Evaluation was performed on February 27, 2006. (Exhibit 134) The physical therapist noted that Claimant's terminated activities early fearing that functioning beyond her perceived capacity levels would increase her symptoms and/or discomfort. (Exhibit 134) The physical therapist concluded Claimant was capable of sedentary part-time work, at four to five hours a day in a job that allows for frequent position changes, for example, a nursing consultant or case manager in a per diem part-time capacity. (Exhibit 134) Dr. Estock (Family Physician) concurred with such findings on March 1, 2006. (Exhibit 135)

The day after her Functional Baseline Evaluation was performed, Claimant suffered from an exacerbation of diffuse pain and was prescribed a Medrol Dosepak (steroid). (Exhibit 136) On March 9, 2006, Claimant was seen by Dr. Fiengold (Homoeopathist) who also noted the severe flare-up in February that left her with pain of 10 on a Visual Analog Scale of 10. (Exhibit 137)

On March 10, 2006, Dr. Fiengold (Homoeopathist) responded to Hartford's request stating that Claimant could not perform light or medium duty work for an eight hour day. (Exhibit 138) She opined:

> It is extremely unlikely that Ms. Chao will be able to work in her profession of nursing because she takes OxyContin and Percocet every day to control her chronic pain. This would make it impossible for her to pass the drug test that is essential for hiring. I would doubt Ms. Chao would be able to work in any nursing capacity, even one without drug testing as a prerequisite, because of the physical effort involved in working with patients... keep in mind that Ms. Chao suffers from frequent, but inconstant, cloudy mental functioning, and recent memory deficits, probably as a result of her taking Wellbutrin and Effexor. This would preclude, in my opinion, Ms. Chao's reliability working with sick people. Due to the unpredictable nature of the acute exacerbation of Ms. Chao's chronic ailments, when she is bedridden, it is unlikely she could work in any capacity in the workforce that requires regular attendance.

Dr. Fiengold concluded that she could work at home for four hours daily, where she could set her own hours, and would be able to frequently change positions between sitting, standing, and walking. (Exhibit 138)

On March 15, 2006, Dr. Houser (Psychiatrist) responded to Hartford's request stating that he had treated Claimant for the last two years for Major Depression, Recurrent, Moderate (296.32) and Dysthymic Disorder (300.4) (i.e. chronic mood disorder). (Exhibit 139) He reported:

> Her depression stems from her Fibromyalgia, which was diagnosed over nine years ago, and the subsequent loss of her ability to function at work and at home. She continues with chronic pain that can oscillate in intensity, but by Ms. Chao's report, is always present.

> Her current symptoms include dysphoria, anhedonia, low energy, difficulty concentrating, social isolation, intermittent crying episodes, and anxiety. Objectively she presents with psychomotor retardation, blunted affect, tearfulness, fair grooming, decreased tone and tempo of speech, and anxious behaviors. She is only able to perform a limited amount of her activities of daily living: a cleaning service visits her house several times a week to maintain the house, her husband does all the cooking and shopping; and she mainly gets out of the house for doctor visits.

> Due to the above symptoms and chronicity of her pain, Mrs. Chao continues to be unable to perform any type of work, especially her past career as a nurse anesthetist. And with the nature of Fibromyalgia and the direct relationship between depression and pain, I do not anticipate significant improvement in her depression n in the future unless there is a drastic improvement of her chronic pain.

On March 31, 2006, Dr. Houser (Psychiatrist) noted that Claimant continues to suffer from "persistent pain" and that she suffered increased pain recently while on a trip to Florida with her family. (Exhibit 140) He again discussed the possibility of trigger point injections. (Exhibit 140)

After reviewing Claimant's medical records and the opinions from two of her doctors that she could work no more than four to five hours a day in a sedentary capacity in a job that allows for frequent position changes, and from one that she could not work at all in any capacity, Hartford's reviewing doctor, George Kazda, MD, found that it was likely that Claimant was addicted to narcotic medication and "with reasonable degree of medical certainty [Claimant] has the physical functional capacity to return to work at the medium, light and sedentary level of occupation on a full-time basis." (Exhibit 141) It was found she was able to work in the following capacities, including, but not limited to, Cardiac Monitor Technician, General Duty Nurse, Office Nurse, Surgical Technician (all sedentary light and medium work levels). (Exhibit 142) This conclusion is clearly suspect in light of her limitations and prescribed medications she is taking.

Dr. Friedman (Physiatrist) noted on April 28, 2006, that Claimant continues to suffer from chronic pain and advised she should remain on her current regime of OxyContin (narcotic pain

reliever) forty (40) mg. four times day and Percocet (narcotic pain reliever) for break through pain. (Exhibit 143)

On April 28, 2006, Claimant was informed by Hartford that her LTD benefits were being terminated and that she could appeal within 180 days (i.e. appeal to Valerie Stroud, Hartford Claims Specialist, on or before October 20, 2006). On May 3, 2006 she received a copy of the same letter again informing her of her right to appeal within 180 days (i.e. appeal to Kim Gabrielsen, Hartford Investigative Specialist, on or before October 27, 2006). (Exhibit 142)

On June 8, 2006, Dr. Friedman noted that Claimant remains in chronic pain that is controlled with her current medications, pain fluctuates and she has episodes of exacerbations. He also noted that she had increased depression. (Exhibit 144)

On August 4, 2006, Dr. Friedman noted that Claimant's pain was not well controlled over the last month and that she had to take extra doses of OxyCotin. Her symptoms were low back pain, primarily gluteal pain bilaterally, fatigue and depression. Claimant requested an increase in the dosage of the OxyCotin and Dr. Friedman recommended rotating medication and changed the medication to Avinza. (Exhibit 145)

# GLOSSARY OF DOCTORS AND MEDICATIONS

Medical Providers
General Meds: Estock (Family Physician) 4-11-95 thru present

Spine injections: Falco (Physiatrist) 10-5-95 thru 2-12-96; Trigger Point injections: Skubick (Neurologist) 2-19-96, 7-31-01 thru 8-22-05 (transferred to Friedman closer); Paulin (Physiatrist): 8-2-04, nerve block, 10-23-04 (no benefit)

Narcotics: Witherell (Anesthesiologist) 8-4-97 thru 7-12-01; transferred to Golden (Anesthesiologist) 7-12-01 thru 7-22-03 (moved); transferred to Skubick (Neurologist) 7-22-03 thru 8-22-05 Friedman (Physiatrist): 8-22-05 - present

Fiengold (Homoeopathist) 9-16-05 thru present (PT, homeopathic remedies)

Hagelyn (Psychologist) 9-28-00 – 6-20-01 – no records
01 thru 04?
Houser (Psychiatrist) 4-5-04 – present – records forthcoming

Maas (Chiropractor) – no records
Lind (Chiropractor) – no records

One-time visits
Cucuzzella (Physical Medicine and Rehabilitation (P.M. & R.) September 22, 1995
Rudin (Orthopaedic Spine Surgeon) late Sept/early/Oct
Koyfman (neurological surgery) 9-7-95 (recommend head MRI to rule out (MS) if negative, lumbar myelogram may be considered and check spinal fluids)
Rudin (Orthopedic Spine Surgeon) 9-25-95 (treating intermittent back pain)
Murphy (Rheumatologist) 11-25-96 (only recommended Flexiril 10 mg. for night spasms)
Thew (Dermatologist) 6-26-97 (rash)
Rosen (IME) 1-14-97 (independent exam)
Carrunchio (Neurologist) 2-5-99 (referral to rheumatologist)
Kolasinski (Rheumatologist? Penn U) 3-15-99 (concern w/ use of narcotics, does not support steroids, avoiding naps during day; recommends psychotherapy for psychological issues (coping skills)
Nigro (Psychologist) 5-29-97 biofeedback and alphawave training (did not help)
Chao (Orthopedist) 6-4-02 (sprained ankle)
Gerwin (Neurologist) 6-24-05 (recommended sleep study)
DeBerardinis (Center for sleep disorders) 7-28-05 (recommending sleep study)

20

<u>Medications</u>
Avinza, Percocet, Demerol, OxyContin/ OxyCodone, Fentanyl /Duragesic patch, Methadone, Dilaudid, Ultram (narcotic pain relievers)
Celexa, Prozac, Wellbutrin, Effexor XR, Paxil, Elavil (anti-depressants)
Lorazepam (Generic Ativan) (anti-anxiety)
Imitrex (pain relief)
Skelaxin, Zanaflex, Flexeril (muscle relaxant)
Sonata, Ambien, Lunesta, Tenazepam (Restoril) (sleep aid)
Allegra, Caritin D, Phenergan, Dura-vent (antihistamine)
Provigil (wakefulness-promoting agent)
Ergotamine, Wigraine, Cafergot, Midrin (migraines)
Augmentin, Avelox, Amoxil (antibiotic)
Diamox (mountain sickness)
Diflucan, Terazol (antifungal medication)
Celebrex, Vioxx, Naprosyn, Relafen, Daypro, Motrin, Cataflam, Toradol (nonsteroidal anti-inflammatory drugs or NSAIDs)
Azmacort inhaler, Medrol-Dosepak, Methyl-Predisone Dosepack (Steroid)
Lidoderm patches (post-shingles pain reliever)
Diprolene AF (topical steroid)
Promethazine (decongestant)
Nasonex (Nasal spray)
Albuterol inhaler, Vancenase inhaler, Proventil inhaler, Azmacort (asthma)
Synthroid (thyroid hormone)
Cinada ?
Pulstilla 220 c (homeopathic herbal remedy for migranies?)
Nux Vomica (homeopathic herbal remedy for constipation?)
PrunusSpinosa (homeopathic relief of fatigue, lassitude, sadness and indifference)
Rhus toxicodendron  (homeopathic relief of fibromyalgia)
Phosphorus  (homeopathic relief of anxiety, allergies?)
Arsenicum album (homeopathic relief of depression?)

# Exhibit D

*(Letter from Hartford to Ms. Chao upholding termination of benefits decision, dated December 1, 2006)*



THE
HARTFORD

December 1, 2006

Oberly, Jennings & Rhodunda, P.A.                                    OJR
Attention: William J. Rhodunda, Jr.
1220 Market Street, Suite 710                                      DEC 0 6 2006
Post Office Box 2054
Wilmington, DE 19899

RE:    Claimant:      Jennifer Chao
       Policyholder:  Christiana Care Health System
       Policy No.:    GLT 33229

Dear Mr. Rhodunda:

This letter is in reference to the above claim for Long Term Disability Benefits (LTD). In response to your appeal of our termination of Ms. Chao's claim we have reviewed her file in its entirety. Based on our review as well as additional information we obtained, we determined that the decision to terminate Ms. Chao's claim was appropriate and therefore, the decision will stand.

Please refer to the letter dated April 28, 2006 for the policy provisions that apply to Ms. Chao's claim and for the specific rationale used in the initial decision to terminate her claim.

Ms. Chao's file reflects that she initially reported an inability to work due to chronic pain in multiple areas. After undergoing testing that yielded relatively normal neurological findings, she was ultimately diagnosed with Fibromyalgia. Her file also reflects that she suffered from anxiety and depression. Her claim was approved throughout the own occupation period and beyond as it was determined her symptoms precluded her from working in any capacity.

During a periodic review however, surveillance was conducted wherein Ms. Chao was observed performing various activities that appeared inconsistent with her reported limitations. For further clarification her physicians were sent the investigative material and were further asked whether Ms. Chao would be capable of working. Dr. Freedman responded by indicating that he would not be involved in that aspect of Ms. Chao's care. Dr. Mass deferred to Dr. Estock, who, when contacted, suggested a Functional Capacities Evaluation (FCE). Per Dr. Estock's recommendation an FCE was indeed conducted and while the evaluator felt Ms. Chao could only perform sedentary to light duty work on a part-time basis, also noted that Ms. Chao terminated many of the tests early due to fear of discomfort. Surveillance was also conducted the day of the FCE wherein Ms. Chao left the test walking slowly with a cane but then a few hours later she is seen walking briskly and fluidly with her dog.

Minneapolis Regional Office
Benefit Management Services
3800 American Blvd. West
Bloomington, MN 55431-4440
Telephone (952) 656-6900
Toll Free (800) 752-9713
Fax (952) 656-6227

As her functional ability remained unclear a medical record review was conducted by Dr. Kazda. Dr. Kazda contacted Dr. Estock who acknowledged he had not viewed the surveillance. Dr. Kazda also spoke with Dr. Feingold who also had not viewed the surveillance but believed that Ms. Chao could only work on a part-time basis. After reviewing the evidence Dr. Kazda opined that Ms. Chao retained the capacity for full-time work. A vocational analysis yielded alternative occupations deemed appropriate and it was therefore determined that the weight of the evidence failed to support Ms. Chao's inability to work and her claim was closed.

On appeal you submitted a letter on behalf of Ms. Chao arguing that it is clear Ms. Chao is at the mercy of her condition and as such she suffers from both good and bad days. You indicate that because of this, Ms. Chao is unable to sustain any type of work. In support of your position you submitted letters from Ms. Chao's relatives and friends, as well a summary of her claim and all the claim documents.

To initiate the review of Ms. Chao's appeal, her claim file was reviewed in full. It is clear that Ms. Chao certainly perceives herself as very limited and it is likely she does have some degree of pain that affects her functionality. Thus, it is not surprising that her relatives and friends perceive her in the same manner as that is how she can present herself. The exception to this is the surveillance, especially the surveillance conducted the day of the FCE since she leaves the clinic using a cane and walking slowly but then later is seen walking normally without an assistive device. Either Ms. Chao's brief rest after the FCE fully restored her function or she alters her presentation depending upon whether she believes she is being observed. This is not to say that Ms. Chao's diagnoses aren't indeed real or limiting, but because Fibromyalgia is a condition that typically relies heavily upon the patient's report, it is important to determine whether that report is consistent and accurate and the surveillance does bring this into question. In reviewing earlier medical reports, the Independent Medical Examination (IME) conducted by Dr. Rosen is notable insofar as he felt her physicians have basically endorsed her disability by allowing her off work completely rather than encouraging a return to work in a lighter duty capacity. Dr. Rosen also notes that Ms. Chao's parental responsibilities, the fact that some relatives are physicians, as well as her own perception, are complicating Ms. Chao's motivation and functional picture.

In reviewing the medical information from Ms. Chao's own physicians and the reviewing physicians, it is clear that there are varying opinions regarding Ms. Chao's capacity to work. In an effort to reconcile these varying opinions, it was felt that an additional specialist review would be helpful include an analysis of both her physical and psychiatric complaints.

Dr. Jacquelyn Olander, Licensed Psychologist and Consulting Neuropsychologist, conducted the review of Ms. Chao's psychiatric complaints. Dr. Olander attempted to reach Dr. Houser for clarification although the phone calls were not returned. After reviewing the evidence Dr. Olander noted that Ms. Chao's subjective reports as noted in the medical records are inconsistent with her presentation. As an example she noted that Dr. Houser's letter dated March 15, 2006 denotes significant psychological findings yet Ms. Chao was observed on February 27, 2006 functioning and interacting normally. In sum, Dr. Olander found insufficient evidence to support Ms. Chao's inability to work from either a psychiatric or cognitive perspective.

Dr. Robert Marks, Board Certified in Neurology and Physical Medicine and Rehabilitation, conducted the review of Ms. Chao's physical complaints and in so doing attempted to speak with both Dr. Estock and Dr. Feingold. Dr. Marks contacted Dr. Estock's office on numerous occasions but was ultimately told that Dr. Estock would not be available to respond. Dr. Marks did speak with Dr. Feingold however who indicated she had only read the written reports of the surveillance but felt that it was clear that at times a patient can do more and function better than at other times. Dr. Feingold did not believe Ms. Chao was depressed and acknowledged that the physical complaints are somewhat nebulous yet she did not offer a clear opinion as to whether Ms. Chao was capable of working.

After speaking with Dr. Feingold and reviewing the evidence on file Dr. Marks concluded his review as follows:

Based on the available medical documentation, it is the opinion of this reviewer that the claimant is not physically precluded from performing a sedentary or light level occupation with some limitations....Limitation/restrictions regarding the claimant's abilities are based primarily on her repeated subjective report. The claimant should be able to sit at least 30 minutes at a time, then with a brief break, following by continuation of the sitting. Standing should also be possible for at least 15-20 minutes at a time. The reviewer observed no restrictions or limitation with regard to handling, fingering, feeling, reaching, etc., as they apply to the upper extremities. The claimant did state that she can type and write.

Based on the above reviews, in conjunction with the other evidence on file, there remains insufficient evidence to support Ms. Chao's inability to work in any occupation. To date, multiple physicians have opined that Ms. Chao is capable of full-time work including Dr. Kazda, Dr. Olander, and Dr. Marks, as well as the nurse case manager who reviewed the file, all of whom reviewed not only the medical records but also viewed the surveillance. While Dr. Estock and Dr. Feingold suggested part-time work only, their respective opinions are not based on the totality of the evidence, i.e., the surveillance which serves as fairly clear indicator that Ms. Chao's reported limitations can be inconsistent with her presentation during office visits. The restrictions noted by Dr. Marks appear very reasonable and appropriate and would allow for full-time work in a sedentary to light duty capacity, commensurate with three of the four occupations identified during the vocational analysis.

Therefore, based on the contractual provisions of the Christiana Care Health System Long Term Disability Policy, as well as the findings of Ms. Chao's providers and the independent physician reviewers, we find insufficient evidence to support disability from any occupation.

This determination as described in the above analysis represents our final decision on this claim.

You are entitled to receive upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to this claim. You may bring a civil action under section 502(a) of The Employee Retirement Income Security Act of 1974 (ERISA).

Sincerely,

James A. Powell
Senior Appeal Specialist
Hartford Life And Accident Insurance Co.

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
CHAO, JENNIFER

## DEFENDANTS
HARTFORD LIFE INSURANCE COMPANIES, INC.; HARTFORD LIFE + ACCIDENT INSURANCE COMPANY; CHRISTIANA CARE HEALTH SYSTEM, INC. F/K/A MEDICAL CENTER OF DELAWARE GROUP LONG TERM DISABILITY INS. PLAN; CHRISTIANA CARE HEALTH SYSTEM F/K/A MEDICAL CENTER OF DELAWARE.

**(b)** County of Residence of First Listed Plaintiff    NEW CASTLE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)    WILLIAM J. RHODUNDA JR.
OBERLY, JENNINGS + RHODUNDA, P.A.
1220 MARKET ST., SUITE 710; POB 2054
WILMINGTON, DE 19899     (302) 576-2000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ❏ 1 U.S. Government Plaintiff
- ❏ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ❏ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal 28 USC 157 | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881 | | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 650 Airline Regs. | ❏ 830 Patent | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❏ 345 Marine Product Liability | ❏ 660 Occupational Safety/Health | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 690 Other | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| | ❏ 355 Motor Vehicle Product Liability | **LABOR** | ❏ 861 HIA (1395ff) | ❏ 810 Selective Service |
| ❏ 160 Stockholders' Suits | ❏ 360 Other Personal Injury | ❏ 710 Fair Labor Standards Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/Exchange |
| ❏ 190 Other Contract | **PERSONAL INJURY** | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | ❏ 875 Customer Challenge 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Med. Malpractice | ❏ 730 Labor/Mgmt.Reporting & Disclosure Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | ❏ 365 Personal Injury - Product Liability | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | **PERSONAL PROPERTY** | ☒ 791 Empl. Ret. Inc. Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 370 Other Fraud | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 371 Truth in Lending | | | ❏ 895 Freedom of Information Act |
| ❏ 240 Torts to Land | ❏ 380 Other Personal Property Damage | | | ❏ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ❏ 245 Tort Product Liability | ❏ 385 Property Damage Product Liability | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | |
| | ❏ 441 Voting | ❏ 510 Motions to Vacate Sentence | | |
| | ❏ 442 Employment | **Habeas Corpus:** | | |
| | ❏ 443 Housing/Accommodations | ❏ 530 General | | |
| | ❏ 444 Welfare | ❏ 535 Death Penalty | | |
| | ❏ 445 Amer. w/Disabilities - Employment | ❏ 540 Mandamus & Other | | |
| | ❏ 446 Amer. w/Disabilities - Other | ❏ 550 Civil Rights | | |
| | ❏ 440 Other Civil Rights | ❏ 555 Prison Condition | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from another district (specify)
- ❏ 6 Multidistrict Litigation
- ❏ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. §§ 1001, et. seq.

Brief description of cause:
RECOVER EMPLOYEE BENEFITS PURSUANT TO ERISA

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE

DOCKET NUMBER

DATE   11/28/07

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 07  774 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 2 _____ COPIES OF AO FORM 85.

_____ 11/28/07 _____
(Date forms issued)

X _____ Lilley Van Dyck _____
(Signature of Party or their Representative)

X _____ Lilly Van Dyk _____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action